RICE, Appellant, vs. THE CITY OF MILWAUKEE and others, Respondents.

*September 5 — September 20, 1898.*

*Municipal corporations: Constitutional limit of indebtedness: Offsets: Diversion of specific fund.*

1. The amount of money in a city treasury to the credit of the school fund, which is pledged to the support of the public schools and cannot lawfully be diverted to any other purpose, cannot be deducted from the amount of the indebtedness of the city, in determining whether the constitutional limit of indebtedness has been reached.

2. In determining that question, the amount to the credit of a "bond, interest, and sinking fund," which under the charter is set apart for the payment of principal and interest on bonds and scrip of the city and cannot lawfully be used for any other purpose, is a proper credit to be considered in reduction of the indebtedness.

3. Estimated revenues to be derived from liquor licenses, from a street railway tax or license based upon earnings, and from other like sources, being uncertain in amount, not in process of collection, and not dependent upon any act of the city, cannot be considered as offsets against the city's indebtedness; especially where the moneys reasonably to be expected from such sources have been anticipated in the annual budget.

4. Where, for the purpose of paying overdrafts on other funds, money is drawn from a fund over which the council has no control except to pay regular demands upon it, the amount of the overdrafts should be considered a debt, in determining the amount of the city's indebtedness.

APPEAL from an order of the superior court of Milwaukee county: GEO. E. SUTHERLAND, Judge. *Reversed.*

For the appellant there was a brief by *Miller, Noyes, Miller & Wahl,* and oral argument by *Geo. P. Miller.* They argued, among other things, that in order to be available in reduction of the outstanding indebtedness the cash on hand must be lawfully applicable to the payment of such indebtedness. If such cash belongs to a particular fund pledged by law for a specific purpose, against which there is no outstanding in-

debtedness, the amount of cash belonging to such specific
fund cannot reduce, within the meaning of the constitution,
the amount of other outstanding indebtedness. *French v.
Burlington*, 42 Iowa, 614; *Council Bluffs v. Stewart*, 51 id.
385; *Earles v. Wells*, 94 Wis. 285, 299. Within the mean-
ing of the constitution, when funds are in fact diverted, in
contemplation of law they are not diverted. *Hohl v. West-
ford*, 33 Wis. 322; *People ex rel. Dannat v. Comptroller of
N. Y.* 77 N. Y. 50; *People ex rel. Downing v. Stout*, 23 Barb.
338, 348; *State ex rel. Board of Education v. Union*, 52 N. J.
Law, 69.

For the respondents there was a brief by *Carl Runge*, city
attorney, *L. W. Halsey*, assistant city attorney, and *R. S. Witte*,
second assistant city attorney, and oral argument by *Mr.
Halsey* and *Mr. Witte*.

BARDEEN, J. The plaintiff seeks in this action to restrain
and enjoin the defendant the city of *Milwaukee* from issuing
three series of its corporate bonds, aggregating $300,000.
The city had passed ordinances providing for the issue of
$80,000 of so-called "garbage disposal bonds," $80,000 "bridge
bonds," and $140,000 "bonds for permanently improving
streets," and was about to issue the bonds when this suit
was commenced. The plaintiff secured a preliminary in-
junction from a court commissioner, and an order to show
cause before the court why such injunction should not be con-
tinued pending the suit. The defendants contested the order,
and moved to dissolve the preliminary injunction; and, upon
a hearing had before the superior court, the injunction was
vacated. The plaintiff appeals from such order.

The basis of plaintiff's complaint, and the facts sought to
be established on the hearing, were that the proposed bond
issue was in excess of the constitutional limit of five per
cent. of the assessed valuation of the city. Some other
questions were raised and ably discussed in the briefs and

at the bar; but the view we have taken of the case renders it unnecessary to consider or dispose of them. As it appears to us, then, the main question is whether the showing on the hearing of the order to show cause was sufficient to indicate that the proposed bond issue was in excess of the constitutional limit. Const. art. XI, sec. 3. This section is of the following purport: No city shall be allowed to become indebted in any manner or for any purpose to an amount, including existing indebtedness, in the aggregate exceeding five per cent. on the value of the taxable property therein.

Aside from the complaint and answer, the proof before the court consisted of affidavits of certain city officers and others who had made examination into the city's financial status, all of which are preserved in the bill of exceptions. All parties agree that the debt limit, as ascertained according to the constitutional basis, was $7,234,171.25. Admittedly, any indebtedness created in excess of that amount would be unlawful. The chief difficulty we have had has been in ascertaining, from the great mass of figures presented, the exact financial condition of the city. Counsel did not agree, and we have arrived at a result as best we could from the record.

At the date of the hearing, there were outstanding city bonds of the different series to the amount of $6,789,250, upon which there was due interest, July 1, 1898, amounting to $163,766.25, making total indebtedness due on bonds, at that time, $6,953,016.25. There was also other city indebtedness, on contracts, claims allowed, judgments, etc., admitted to be $1,050,586.25. The total city indebtedness would therefore be $8,003,602.50. It should be observed in passing that the claim was made on the argument that the item above, of interest on bonds, was included in the item of other city indebtedness, and is therefore included twice in reaching the results noted. We are unable to thus cipher

it out from the great mass of figures presented. It is possible that in this great wilderness of figures, hidden in the maze of some "trial balance," or lurking behind the totals of some "ledger balance," there may be some way of demonstrating this to be a fact; but counsel were unable to make it clear on the argument, and our own efforts have not been more successful. We have therefore reached a pivotal point in our computation. By reference to the totals in the figures given, it will be noticed that the city's indebtedness considerably exceeds the five per cent. limit.

It is conceded on both sides that whatever cash there may be in the treasury properly applicable thereto is to be considered in reducing the city's indebtedness. It is admitted that, at the time of the hearing, there was a general cash balance in the treasury of $1,096,558.15. In dealing with this item we have been furnished a great variety of computations, all depending upon how much of this fund is found properly and legally applicable to the reduction of the city's debts. In dealing with a kindred question, this court said, in *Earles v. Wells*, 94 Wis. 285: "So long as the current expenses of the municipality are kept within the limits of the moneys and assets actually in the treasury, and the current revenues collected or in process of immediate collection, the municipality may be fairly regarded as doing business on a cash basis, and not on credit,— even though there may be for a short time some unpaid liabilities. . . . But the moment an indebtedness is voluntarily created 'in any manner or for any purpose,' with no money nor assets in the treasury, nor current revenues collected or in process of collection for the payment of same, that moment such debt must be considered in determining whether such municipality has or has not exceeded the constitutional limit of indebtedness." The ruling in this case was approved in the recent case of *Crogster v. Bayfield Co.* 99 Wis. 1. There is no disposition to enlarge the rule as there laid down.

The trial balance taken from the city treasurer's books, July 2d, shows a credit to the "school fund" of $378,650.99, and is included in the amount of cash on hand. This fund is pledged to the support of the public schools, and cannot be lawfully diverted to any other purpose. There is also another item of "bond, interest, and sinking fund," amounting to $664,266.25, which, under the charter, is set apart for the payment of principal and interest on bonds and scrip of the city. City Charter [Laws of 1874, ch. 184], ch. 11, sec. 9. This fund is not within the control of the common council, and cannot be used for any other than the purpose above stipulated. It is therefore a proper credit or asset to be considered in reduction of the city indebtedness. The difference between the sum of these two funds and the balance of cash on hand, amounting to $53,640.91, is also admitted to be a proper credit.

Tabulating the figures, we reach the following result:

| | | |
|---|---:|---:|
| Total city indebtedness | | $8,003,602 50 |
| Sinking fund | $664,266 25 | |
| Balance cash on hand | 53,640 91 | |
| Total | | 717,907 16 |
| Balance city indebtedness | | $7,285,695 34 |
| Five per cent. limit | | 7,234,171 25 |
| Limit exceeded | | $51,524 09 |

If these deductions are correct, it is apparent that the city of *Milwaukee* had already exceeded its debt limit, and the attempt to make a further bond issue was in violation of the inhibitory provision of the constitution.

But it is claimed that there are other matters that must be taken into consideration in reduction of the city's debts. It appears that when the city comptroller presented the annual budget in January, 1898, he deducted therefrom the sum of $410,500, as estimated revenue to be derived by the city, during the year, from liquor licenses and other sources.

The liquor licenses became payable in July, and, so far as we can learn, the other sums come in at different times during the year. Neither the bill of exceptions nor the pleadings inform us of the items that go to make up this sum, or the sources from which it is to come; but respondents' counsel have attempted to supply the omission in their brief. They further informed us that another item of about $50,000, a tax or license from the street railway company, was omitted by the comptroller, and ought to be here considered in reduction of the city's indebtedness. They have furnished us with several computations on this basis, which, if admitted, would bring the proposed bond issue within the prescribed limit. The item as to the street railway tax or license is of uncertain amount, depending upon its earnings, and payable in December of each year. Laws of 1897, ch. 223. The amount the city may receive from other sources is also uncertain, and not dependent upon any act of the city. *Earles v. Wells,* 94 Wis. 285, is appealed to as sustaining the claims that these items may be considered as "revenues in process of immediate collection," and "available assets and resources," convertible into cash, which may be considered as offsets against the city's debt. As already noted, the moneys to be derived from these sources are entirely indefinite and uncertain. They were not in the process of collection, and could be collected only at the will of parties who sought privileges for which license charges were made, and for that reason could not be considered as available assets or resources. The "revenues" mentioned in this decision had reference only to such revenues as the corporation had levied, and had a legal right to enforce, regardless of any one's will or pleasure. The "available assets and resources" referred to means tangible property in the treasury, legally available, and properly applicable to the payment of debts, and readily convertible into money for that purpose. Were this not so, it appears from the record that the money reasonably ex-

pected to be derived by the city from licenses, etc., had been anticipated in the annual budget. This document shows that the actual financial needs of the city had been reduced by the exact amount estimated as coming from these sources. It therefore seems clear that these unknown and unascertained items of income should not and cannot be considered as offsets against the city's indebtedness. If our conclusions are correct, it is readily apparent that the city had already pledged its credit to an amount exceeding the debt limit, and had no right to make the proposed bond issue.

Another question in connection with this was discussed with much learning and ability. It seems that, under the scheme of regulating their financial affairs, the charter creates a large number of funds which are raised by taxation, some of which are controlled by the common council, and some of which are devoted to certain specific purposes and can only be applied in satisfaction thereof. The money raised for these different funds comes to the hands of the treasurer in gross sums, and, it seems, is not kept separate. As claims against the city mature and are allowed, orders are drawn, and it often happens that the money to the credit of a specific fund is exhausted; yet the treasurer continues to pay orders from the money in his hands, with the result that other of the funds are greatly overdrawn. It was argued that when a fund over which the council had no control except to pay the regular demands upon it had money to its credit, and other funds had been overdrawn, in determining the city's financial status the money on hand must be treated as belonging to that fund, and the overdrawn fund must be considered as a debt to the amount of such overdraft. In other words, that the council had no right to divert the money belonging to funds, such as the school fund and the like, to pay overdrafts on other funds, and consider it as a debt paid, when attempting to ascertain its financial condition in relation to the debt limit. It would seem to be

very clear that when money is raised for a special purpose, under an express limitation to a particular use, it cannot lawfully be used for any other purpose. Any diversion of it to other purposes in order to increase the debt limit cannot be tolerated. The debt remains in point of law, and must be considered just as substantial as though it had never been paid. Borrowing the money from the prohibited fund does not extinguish the debt. Any other holding would commit us to the palpable absurdity of saying that a person may pay his debts by taking money from one pocket and putting it in the other.

*By the Court.*— The order of the superior court of Milwaukee county is reversed, and the case is remanded with directions to grant the injunction prayed for, and for further proceedings according to law.