STATE of Wisconsin EX REL. Bronson C. LA FOLLETTE,
Petitioner,

v.

Donald K. STITT and David W. Opitz, Respondents.

Supreme Court

*No. 83–1502–OA. Argued September 9, 1983.—
Decided September 27, 1983.*
(Also reported in 338 N.W.2d 684.)

For the petitioner there were briefs by *Dewitt J. Strong,* assistant attorney general, with *Bronson C. La Follette,* attorney general, and *John S. Holbrook, Jr., Steven D. Stern,* and *Quarles & Brady,* all of Milwaukee, and oral argument by *Mr. Strong* and *Mr. Holbrook.*

For the respondents there were briefs by *Donald K. Stitt,* Port Washington, and *Robert N. Trunzo,* Brookfield, and oral argument by *Mr. Trunzo.*

Amicus Curiae brief was filed by *David Prosser, Jr.,* Appleton.

Amicus Curiae brief was filed by *John H. Bowers, Lawton & Cates,* Madison, for Wisconsin Council 24, District Council 40, District Council 48 and Fire Fighters of Wisconsin.

PER CURIAM. This is an original action commenced by Attorney General Bronson C. La Follette seeking a declaratory judgment that the State of Wisconsin Operating Notes of 1983 when issued, sold and delivered in the manner provided by the Authorizing Resolution issued by the State Building Commission pursuant to 1983 Wisconsin Act 3, will be valid enforceable contractual

obligations of the State of Wisconsin. The respondents, both members of the legislature, ask this court to declare Act 3 invalid because it was not properly enacted and because it authorizes a state debt in violation of the state constitution.[1] Because we decline to review the validity of the procedure followed by the legislature in enacting Act 3 and because we conclude the operating notes are not public debt within the prohibition of Article VIII, Sec. 4 of the Wisconsin Constitution, we declare that the notes issued pursuant to the authority of 1983 Wisconsin Act 3, are evidence of a valid enforceable obligation of the State of Wisconsin.

The facts are undisputed: The state proposes to issue $750 million of operating notes of 1983 to ease cash flow imbalances during the 1983–84 fiscal year. Such notes are to be issued pursuant to 1983 Wisconsin Act 3. The act provides that at any time the department of administration determines that a deficiency will occur in the funds of the state so that the state will be unable to meet its operating obligations in a timely manner, the department may by a request signed by the secretary of administration and the governor and approved by the joint committee on finance, ask the state building commission, by authorizing resolution, to issue operating notes to fund the anticipated deficit. The act further specifies that no request from the department of administration can be made, nor authorizing resolution from the state building commission adopted, on or after the effective date of the 1985 biennial budget act. Moreover, the act states that

---

[1] Prior to the commencement of this action the respondents had commenced an action in Dane County Circuit Court against the Secretary of the Department of Administration and others seeking a declaration that Act 3 was not properly enacted and is unconstitutional. Further proceedings in that action were stayed pending further order of this court. *See, Petition of Heil*, 230 Wis. 428, 446, 284 N.W. 42 (1934). Based on our holding in this action, we now direct the dismissal of the circuit court action.

no operating note issued may have a maturity date later than the effective date of the 1985 biennial budget act. The authorizing resolution issued by the state building commission provides that the notes will mature on June 15, 1984, with all principal and interest on such notes to be paid from revenue received during the fiscal year. The proceeds from the notes will be deposited in the state's general fund to be used to fund state assistance payments to municipalities and school districts, to reimburse various segregated funds of the state from which monies have been temporarily allocated for general fund purposes and to finance the state's day-to-day operations.

Funds derived from anticipated tax revenues—primarily personal income, corporate income and sales taxes —to be paid within this fiscal year will be used to repay the notes. The act requires the secretary of the department of administration to impound such funds and transfer them from the general fund to the operating note redemption fund periodically during the 1983–84 fiscal year. According to the authorizing resolution, the final impoundment is to be made on May 15, 1984, at which time 100 percent of the amount of principal and interest payable on the notes at maturity on June 15, 1984, is to be on deposit in the redemption fund. The act appropriates from the general fund to the redemption fund a sum sufficient for the payment of principal and interest on the notes and for the payment of all monies required to be impounded. Funds in the redemption fund are subject only to the rights of the holders of the state's general obligation bonds and notes. If the state fails to pay any operating note, the act gives the holder the right to compel such payment in an action against the state.

We granted the petition to commence an original action because this matter is *publici juris* and requires a prompt and authoritative determination by this court in the first instance, *Petition of Heil, supra; see also, In Re Exercise*

*of Original Jurisdiction,* 201 Wis. 123, 229 N.W. 643 (1930).

We deem the two issues raised in this action to be:

(1) Is 1983 Wisconsin Act 3 invalid because the legislature did not follow specified statutory procedures in enacting the legislation?
(2) Are the operating notes "public debt" within the meaning of Article VIII, Sec. 4 of the Wisconsin Constitution which prohibits the state from contracting "public debt" except in certain situations not applicable here?

## *Procedural Validity of Enactment*

The respondents contend that Act 3 is invalid because neither house of the legislature referred the act to the joint survey committee on debt management as required by sec. 13.49(6) before passage. Section 13.49(5) states that the purpose of the joint survey committee on debt management is to ". . . advise the legislature on matters regarding coordination of activities of state agencies and independent state authorities issuing debt and revenue obligations or using proceeds of such obligations . . . ." The committee is charged with reviewing and advising the legislature whenever legislation is proposed which involves state debt or revenue obligations. Subsection (6) of sec. 13.49 provides in pertinent part:

"Upon the introduction in either house of the legislature of any proposal which affects any existing statute or creates any new statutes relating to the authorization to issue state debt or revenue obligations as set forth in ch. 18, . . . *shall* at once be referred to the committee by the presiding officer instead of to a standing committee. *The proposal shall not be considered further by either house until the committee has submitted a report, in writing,* setting forth an opinion on the fiscal effect upon the state or local government, the effect upon the state's and local government's ability to issue debt and

revenue obligations, the appropriateness of the proposal in relation to the state's and local government's debt policies and the desirability of the proposal as a matter of public policy and the report has been printed as an appendix to the bill and attached to the bill as are amendments . . ." (Emphasis added.)

The respondents contend that the failure of either the assembly or the senate to refer Act 3 to this committee prior to passage invalidates the act. The petitioner, on the other hand, contends that Assembly Bill 104 which ultimately became 1983 Wisconsin Act 3 did not have to be referred to the committee because it did not create state debt or revenue obligations as set forth in ch. 18, Stats.

Because we conclude this court will not determine whether internal operating rules or procedural statutes have been complied with by the legislature in the course of its enactments, we do not address the question of whether sec. 13.49 (6), Stats., applies to this legislation. To discuss or consider the petitioner's argument that the procedure mandated in sec. 13.49, does not apply to Act 3 because the latter did not create state debt or revenue obligations as set forth in ch. 18, would imply that this court will review legislative conduct to ensure the legislature complied with its own procedural rules or statutes in enacting the legislation. For the reasons discussed below, we conclude we will not intermeddle in what we view, in the absence of constitutional directives to the contrary, to be purely legislative concerns; accordingly, we decline to resolve the question of whether sec. 13.49 applies to Act 3.

Courts are reluctant to inquire into whether the legislature has complied with legislatively prescribed formalities in enacting a statute. This reluctance stems from

separation of power and comity concepts, plus the need for finality and certainty regarding the status of a statute. *Baker v. Carr,* 369 U.S. 186, 215 (1962). Although since *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L. Ed. 60 (1803) courts have had the authority to review acts of the legislature for any conflict with the constitution, courts generally consider that the legislature's adherence to the rules or statutes prescribing procedure is a matter entirely within legislative control and discretion, not subject to judicial review unless the legislative procedure is mandated by the constitution. 73 Am. Jur. 2d Statutes, sec. 49, p. 296. If the legislature fails to follow self-adopted procedural rules in enacting legislation, and such rules are not mandated by the constitution, courts will not intervene to declare the legislation invalid. The rationale is that the failure to follow such procedural rules amounts to an implied *ad hoc* repeal of such rules.

This principle has been expressed in 1 Sutherland, Statutory Construction (4th Ed.) sec. 7.04, p. 264, as follows:

"The decisions are nearly unanimous in holding that an act cannot be declared invalid for failure of the house to observe its own rules. Courts will not inquire whether such rules have been observed in the passage of the act. Likewise, the legislature by statute or joint resolution cannot bind or restrict itself or its successors as to the procedure to be followed in the passage of legislation."

Wisconsin has long followed this general rule. *See, e.g., McDonald v. State,* 80 Wis. 407, 411–12, 50 N.W. 185 (1891); *State v. P. Lorillard Co.,* 181 Wis. 347, 372, 193 N.W. 613 (1923); *State ex rel. Hunsicker v. Board of Regents,* 209 Wis. 83, 86, 244 N.W. 618 (1932); and *Outagamie County v. Smith,* 38 Wis. 2d 24, 41, 155 N.W.2d 639 (1968). *See also,* 63 Op. Att'y Gen. 305, 308 (1974); 60 Op. Att'y Gen. 245, 251 (1971); 68 Op. Att'y

Gen. 113 (1976); and Luce, "Judicial Regulation of Legislative Procedure in Wisconsin," 1941 *Wis. L. Rev.,* 439, 453–4 (1941).

In *McDonald v. State, supra,* this court held that it would not declare a law invalid because of the legislature's failure to comply with its own rules of procedure so long as the constitutional requirements for the enactment of legislation had been followed. This court stated:

"The courts will take judicial notice of the statute laws of the state, and to this end they will take like notice of the contents of the journals of the two houses of the legislature far enough to determine whether an act published as a law was actually passed by the respective houses in accordance with constitutional requirements. *Further than this the courts will not go.* When it appears that an act was so passed, no inquiry will be permitted to ascertain whether the two houses have or have not complied strictly with their own rules in their procedure on the bill, intermediate its introduction and final passage. The presumption is conclusive that they have done so. We think no court has ever declared an act of the legislature void for noncompliance with the rules of procedure made by itself, or the respective branches thereof, and which it or they may change or suspend at will. If there are any such adjudications, we decline to follow them." *Id.* at pp. 411–12 (Emphasis added.)

Similarly, in *State v. P. Lorillard Co., supra,* the question was whether sec. 13.06, Stats., which required the legislature to refer appropriation bills to the joint committee on finance before passage, meant that such bills had to be referred by each house before final passage. This court, in rejecting the argument that each house had to refer the proposal, pointed out that there was no constitutional requirement involved and moreover, that the statute as written did not require reference by each house. This court stated: "This is a question of policy for legislative, not judicial, determination." *Id.* at p 372.

Likewise, in *Outagamie County v. Smith, supra,* this court held it had jurisdiction over legislative affairs only to insure that constitutional provisions had been followed by the legislature:

"This court will not interfere with the conduct of legislative affairs in the absence of a constitutional mandate to do so or unless either its procedures or end result constitutes a deprivation of constitutionally guaranteed rights. Short of such deprivations which give this court jurisdiction, recourse against legislative errors, nonfeasance or questionable procedure is by political action only." *Id.* at p. 41.

There is no claim in the instant case that sec. 13.49, Stats., embodies any constitutional requirements. That statute does not codify any constitutional provisions regarding legislative procedures. It is simply a procedural rule, albeit in statute form and thereby imbued with all the dignity and importance of a legislative act passed by both houses of the legislature and signed by the governor. Nevertheless, the fact that sec. 13.49 is something more than a mere internal procedural rule but less than a constitutional requirement, does not remove it from the application of the general rule as stated by Sutherland, *supra.* In one court which has considered the question it has been held that the legislature's failure to follow a procedural rule—even if such rule is embodied in a statute—is not open to judicial scrutiny and cannot be a basis for judicial invalidation of a legislative enactment. *Schweizer v. Territory,* 5 Okla. 297, 47 P. 1094 (1897). Cf. *State v. Essling,* 128 N.W.2d 307 (Minn. 1964), (Nelson, J., concurring pp. 317–23.)

The respondents argue that this court has, on at least one occasion, deviated from the general rule that courts have no authority to invalidate legislation on the ground of legislative noncompliance with procedural statutes. In *State ex rel. General Motors Corp. v. Oak Creek,* 49 Wis.

2d 299, 182 N.W.2d 481 (1971), the basic and dispositive question was, however, whether the statute had been enacted in compliance with Article VIII, sec. 8 of the Wisconsin Constitution which requires that the yeas and nays be recorded in the legislative journals. Peripherally, a question was raised whether the statute had been validly enacted when the legislature had not first referred the matter to the joint finance committee as required by the provisions of sec. 13.10(1), Stats. (1967). This court held that the recording of yeas and nays in the legislative journal as set forth in the constitution was mandatory and that the legislature's failure to do so was sufficient to render the statute in question a nullity.

Despite this dispositive holding on constitutional grounds, this court concluding that sec. 13.10 was mandatory, also stated that the statute was a nullity because the legislature failed to comply with the ". . . statutory mandates for the enactment of a statute relating to taxation." *Id.* at p. 329. This language is *obiter dictum* because the court having concluded the statute was invalid on constitutional grounds, unnecessarily proceeded to discuss whether the statute was invalid due to the legislature's failure to follow statutory procedures. Because this *dicta* is inconsistent with the uniform holding of prior Wisconsin cases and the general rule which limits a court's authority to invalidate legislation only for constitutional violations, we withdraw this language in the *Oak Creek* case and expressly disavow any implication that this court will invalidate legislation when it finds the legislature has violated a procedural statutory provision in passing an act. Unless the claim is that the legislative procedure violated some constitutional provision or right, this court will not, under separation of powers concepts and affording the comity and respect due a co-equal branch of state government, interfere with the conduct of legislative affairs. This is consistent with this court's

decision in *State ex rel. Lynch v. Conta,* 71 Wis. 2d 662, 239 N.W.2d 313 (1976). The issue in that case was whether certain legislators had violated the open meeting law and whether they could be subject to forfeitures for such violations. The case did not present the question of the voidability of legislative actions taken in violation of the open meeting law. *Id.* at p 668. We hold that we will not invalidate a legislative action unless the legislative procedures or statute itself constitutes a deprivation of constitutionally guaranteed rights. *Outagamie County v. Smith, supra,* at p. 41. Because there is no claim here that the legislature's failure to comply with sec. 13.49 and refer A.B. 104 to the joint survey committee on debt management before passage amounts to a constitutional violation or deprivation, we will not further consider the issue of the validity of Act 3's enactment.

Accordingly, we turn to a consideration of whether the operating notes authorized by Act 3 amount to the state contracting public debt in contravention of the constitution.

### Operating Notes as Public Debt

Art. VIII, sec. 4 of the Wisconsin Constitution states:

"The state shall never contract any public debt except in the cases and manner herein provided."

The constitution does not define the term public debt. However, this court has frequently been called on to determine what is public debt within the meaning of this constitutional prohibition. In *State ex rel. Owen v. Donald,* 160 Wis. 21, 151 N.W. 331 (1915) this court held that a legislative appropriation of money for the purchase of land for reforestation and water power purposes, was public debt within the prohibition of Art. VIII, sec. 4. The court defined the word debt as used in the constitution as follows at p. 59:

"There is nothing particularly technical about the meaning of the word 'debt' as used in the constitution. It includes all absolute obligations to pay money, or its equivalent, from funds to be provided, as distinguished from money presently available or in process of collection and so treatable as in hand." *Earles v. Wells*, 94 Wis. 285, 68 N.W. 964, *Doon Tp. v. Cummings*, 142 U.S. 366, 376, 12 Sup. Ct. 220.

Under this definition, public debt in the constitutional sense has two components: (1) it must be an absolute obligation to pay money or its equivalent; and, (2) such money must be paid from funds to be provided, that is, funds that are not presently available or in the process of collection so as to be considered in hand.

In other words, "public debt" includes absolute obligations to pay money or its equivalent; and public debt is further defined in terms of when and how it is payable. If the state's obligation to pay money, even if absolute, is an obligation to pay from money "presently available or in the process of collection," it is not public debt within the meaning of the constitutional prohibition.

The court in the *Donald* case relied on an earlier decision in *Earles v. Wells*, 94 Wis. 285, 68 N.W. 964 (1896) a case involving the issue of municipal, as opposed to state, indebtedness. Municipal indebtedness is regulated in sec. 3 Art. XI of the Wisconsin Constitution. However, cases dealing with municipal debt and its constitutional limitations are relevant to cases involving issue of public debt in the state context of sec. 4, Art. VIII. In *State ex rel. Thomson v. Giessel*, 267 Wis. 331, 352, 65 N.W.2d 529 (1954) a case involving an issue of state debt under Art. VIII, sec. 4, this court stated:

"We deem that the terms 'debt' and 'indebtedness' as used in these two constitutional provisions have the same meanings as both deal with public debt and the under-

lying intent is the same." *See also,* State ex rel. La Follette v. *Reuter, 33 Wis. 2d* 384, 405, 147 N.W.2d 304, (1966) and *State ex rel. Bowman v. Banczak,* 34 Wis. 2d 57, 73, 148 N.W.2d 683 (1967).

Thus, indebtedness under Art. VIII and Art. XI is the same. Consequently, court decisions approving of various plans to meet the constitutional strictures in respect to state indebtedness apply with equal force to municipalities; and, conversely, decisions dealing with municipal debt and its limitations, apply to state indebtedness. See Kiernan, *Wisconsin Municipal Indebtedness, Part I, The Power to Become Indebted and Its Limits,* 1964 Wis. L. Rev., 173, 176, n. 7.

In *Earles v. Wells, supra,* this court dealt with the question of whether certain municipal liabilities were debt within Art. XI. This court stated:

"So long as the current expenses of the municipality are kept within the limits of the moneys and assets actually in the treasury, and the current revenues collected or in the process of immediate collection, the municipality may be fairly regarded as doing business on a cash basis, and not upon credit—even though there may be for a short time some unpaid liabilities. In other words, a municipality's capacity for doing business on such cash basis, with outstanding liabilities, is necessarily measured by the amount of cash on hand and the available assets and resources readily convertible into cash to meet the payment of such liabilities as they become due. But the moment an indebtedness is voluntarily created 'in any manner or for any purpose' with no money or assets in the treasury, nor current revenues collected or in process of collection for the payment of the same, that moment such debt must be considered in determining whether such municipality has or has not exceeded the constitutional limit of indebtedness." *Earles v. Wells, supra* at 298–99.

Thus, this court recognized that obligations for municipal current expenses are not debt in the constitutional sense to the extent that there are current assets on

hand or nearly so to pay off such expenses. These assets on hand include "current revenues collected or in the process of immediate collection." *Id.*

The state in the instant case intends to "borrow" short-term money by issuing the 1983 operating notes to pay for what can generally be classified as current operating expenses. (See Authorizing Resolution). In *School District v. Marine Nat'l Exch. Bank,* 9 Wis. 2d 400, 101 N.W.2d 112 (1960), a statute which authorized short-term borrowings by school districts to pay current operating expenses was challenged on the basis that such borrowings were "indebtedness" under sec. 3, Art. XI of this state's constitution. This court held that such borrowings did not constitute indebtedness for constitutional purposes because they were payable in the current year, the current year's budget included an amount sufficient to pay principal and interest, and taxes in that amount were in the process of collection. This court stated:

"The purpose of the constitutional provision was to limit the burden which those who contract obligations may place upon posterity . . . It is entirely reasonable to conclude that sec. 3, Art XI does not contemplate that the . . . limitation should apply to short-term loans, such loans constituting the doing of business on a cash basis rather than indebtedness.

"What the statute does is put into plain words what the language of sec. 3, art. XI, Const., clearly implies, and what this court since the Wells Case has held the constitutional limitation to mean. Sec. 67.12(8a) Stats., deals with short-term loans required for current operating expenses of the school district and payable out of revenues to which the district is entitled at the time the loans are made . . . To consider as 'indebtedness' loans negotiated for the purpose of paying such current obligations as they arise—loans payable as soon as the awaited tax revenues are actually received—would involve a more-strict construction than this court is willing to place upon the constitutional language, particularly in

view of the interpretation placed upon it in the Wells Case and since approved in a number of cases." *Id.* at 407–08.

The attorney general as petitioner contends that the rationale of the *Marine Bank* case controls this case; therefore, the proposed operating notes are not to be considered public debt within the meaning of Art. VIII, sec. 4, because they are simply short-term obligations to be repaid in the current year from current budgeted revenues. According to the petitioner, both this case and the *Marine Bank* case involve the issuance of short-term notes to meet cash-flow imbalances.

The respondents, on the other hand, argue that these operating notes, even if they are short-term notes, are public debt within the constitutional prohibition. According to the respondents, the constitution does not authorize the contracting of public debt for funding state operating deficits. They assert that public debt can be created only for the specific purposes and pursuant to the specific procedures set forth in Art. VIII, secs. 6 and 7. Section 6 provides an exception for state debt for "extraordinary expenditures" and sec. 7 provides an exception for state debt to repel invasion or for "an emergency." According to the respondents, if the framers of the constitution had intended to permit borrowing to pay for current operating expenses as an exception to the prohibition against creating a public debt, they would have expressly so provided.

Moreover, the respondents cite a 1913 attorney general opinion wherein it was stated that the state could not borrow money for current expenses and pay interest thereon because to do so would violate the provision of secs. 6, 7, and 9, Art. VIII Wis. Const. which:

". . . clearly prohibit the creation of any debt against the state for ordinary current expenses." 2 Op. Atty. Gen. 207, 208 (1913)

According to the respondents, the only thing that has changed in the 70 years since this 1913 attorney general's opinion is fiscal expediency.

We hold that the proposed 1983 operating notes do not contravene the constitutional prohibition against creating public debt because such notes, issued in the manner provided by the authorizing resolution adopted by the state building commission pursuant to 1983 Wis. Act 3, are to be repaid within the current fiscal year from current revenues. *School District v. Marine Nat'l Exch. Bank, supra.* The operating notes are not public debts within the constitutional definition of that term set forth in our prior cases because such notes are only short-term borrowings and such notes are to be repaid in the current year from tax revenues which are in the process of collection. Clearly, the repayment schedule adopted by the current legislature avoids placing a burden "upon posterity." *Id.* at 407. This was, as the *Marine Bank* case stated, the purpose of the constitutional limitation upon debt.

Concededly, the operating notes are intended to be absolute contractual obligations on the part of the state. *See, State ex rel. Warren v. Nusbaum,* 59 Wis. 2d 391, 428, 208 N.W.2d 780 (1973) and *Wisconsin Solid Waste Recycling Authority v. Earl,* 70 Wis. 2d 464, 482, 235 N.W.2d 648 (1975). The act itself in sec. 18.76(2), Stats., gives purchasers remedies against the state if the state fails to repay the notes. However, that is not sufficient to make these notes a public debt within the meaning of the constitutional prohibition. The definition of public debt requires not only an absolute obligation to the state to pay, but also payment is to be made from money "to be provided" as contrasted to that presently available or in the process of collection. *State ex rel. Owen v. Donald, supra,* at p. 59. It is precisely because these operat-

ing notes are to be paid from money in the process of collection that they are not public debt.

The respondents reliance on the 1913 attorney general's opinion to support their argument that the state could not borrow money to meet current expenses is misplaced. Attorney general opinions are entitled only to such persuasive effect as this court deems the opinion warrants. *Wood County v. Bd. of Voc. T & A Ed.*, 60 Wis. 2d 606, 613, 211 N.W.2d 617 (1973) ; *Hahner v. Bd. of Ed.*, 89 Wis. 2d 180, 192, 278 N.W.2d 474 (Ct. App. 1979). We do not find the 1913 opinion persuasive for several reasons.

The 1913 opinion is in error when it states that secs. 6, 7, and 9 of Art. VIII *prohibit* the creation of any debt by the state for current expenses. Only sec. 4 *prohibits* the creation of public debt. The other sections are specific *exceptions* to such prohibition.

An important factor relied upon in the 1913 opinion was the absence of any statute authorizing borrowing to meet state current operating expenses. Unlike the 1913 situation, here there is a detailed statute authorizing the borrowing by the issuance of operating notes.

Also, the 1913 plan to borrow $600,000 to meet current operating expenses made no provision for the repayment of the loan. By the state's failure to detail any plan to repay the $600,000 at a time certain, the obligation surely would have become a debt—a burden on future generations of taxpayers. In the instant case, future taxpayers will not be required to pay off present borrowings. Such borrowings accordingly do not frustrate the purpose of the constitutional prohibition and are not public debt.

The respondents have argued however, that under certain provisions of Act 3, future taxpayers in fact may be required to repay the 1983 operating notes. The re-

spondents cite the definition section of Act 3, sec. 18.71 (4) (a), Stats., which states:

"(4) 'Operating note' means every undertaking of the state to repay a certain amount of a financial obligation which is:
(a) Created for the purpose of funding operating deficits of the state as determined under sec. 16.504(1) [sic] which must be repaid *prior to the end of the fiscal year next following."* (Emphasis added.)

According to the respondents, the emphasized portion of this statute would permit the state to issue operating notes in this 1983–84 fiscal year which would not have to be repaid until the end of the 1984–85 fiscal year—i.e., June 30, 1985; thus, such notes might be a burden on future taxpayers. However, we find that this is not a possibility under other sections of Act 3. The act contains several time limit provisions. Specifically applicable is sec. 18.72(4), Stats., which provides:

"(4) No operating note issued under this section may have a maturity date later than the effective date of the 1985 biennial budget act."

We are presently in the 1983–85 biennium. The 1985 biennial budget act will have an effective date of July 1, 1985. Thus, under 18.72(4) any operating note issued this year or next must have a maturity date no later than July 1, 1985. Even though under the Act operating notes may be issued so that they have a maturity date in a different fiscal year, this provision makes it clear that such notes cannot mature in other than the current biennium. Thus, such notes cannot be a burden on any generation of taxpayers other than the present one.

Moreover, the attorney general asks this court to declare that the operating notes when issued pursuant to the authorizing resolution adopted by the state building commission will be valid contractual obligations of

this state enforceable by their terms and the terms of such authorizing resolution. The terms of both the operating notes themselves and the authorizing resolution specify that the maturity date of the notes will be June 30, 1984. Thus, these operating notes will not and cannot become a burden on future taxpayers. Furthermore, sec. 18.72(1) specifies that ". . . no operating notes originally issued in a fiscal year may be funded or refunded by proceeds of an operating note to mature in a later fiscal year."

The respondents deny the applicability of the rationale of the *Marine Bank* case and the other municipal debt cases to questions of state debt because the municipal cases involved repayment from funds derived from easily calculated and ascertained *ad valorem* property taxes whereas the operating notes are to be paid from estimated tax revenues. Accordingly to the respondents, such anticipated revenues have not been received; although concededly they have been voted and levied, they are not in the process of immediate collection. Moreover, the respondents assert such levies, unlike real estate tax levies, are not certain of collection and in the past the estimated tax revenues have been short from actual receipts by as much as $158 million.

The argument is not persuasive. The fact that municipalities rely on real estate taxes to repay their borrowing for current operating expenses and avoid the debt limitations of Art. XI, and the state relies on different taxes, is not a relevant distinction. Although in the fiscal year 1980–81 estimates of state tax revenues exceeded receipts by some $158 million, this was a difference of less than 5 per cent. Moreover, we do not view municipal tax levies as significantly more certain of collection than are estimated state tax revenues. Both taxes are statistically predictable even though in respect

to each of the actual amounts collected might vary from predicted levels.[2]

In *Rice v. City of Milwaukee*, 100 Wis. 516, 76 N.W. 341 (1898) this court defined revenues to include such taxes as the municipality had levied and had a legal right to enforce regardless of anyone's will or pleasure. *Id.* at 521. There can be little doubt that in the immediate future there will be an annual personal state income tax as provided in sec. 71.01(1), Stats; an annual state corporate income tax pursuant to sec. 71.01(2), Stats; and a state sales tax pursuant to sec. 77.52(2). These various taxes provide the bulk of the state general fund revenues earmarked to repay the operating notes. These taxes when considered with the personal income tax withholding provisions of sec. 71.20, and the provisions enforcing the payment of estimated personal income taxes under sec. 71.21, and estimated corporate income taxes under sec. 71.22, are sufficiently certain in amount and collection to be considered revenues collected or in the process of immediate collection thereby satisfying the constitutional requirements.

Relying on the rationale accepted by this court in *School District v. Marine Nat'l Exch. Bank, supra,* and the cases cited therein, we conclude that operating notes sought to be issued pursuant to 1983 Wisconsin Act 3 will not contravene the constitutional prohibition against contracting public debt. In this case, as in *Marine Bank,* the purpose of the borrowing is to meet current operating obligations. In this case, as in *Marine Bank,* the borrowing is to be repaid in the current year from current budgeted revenues which are presently in the process of collection. In neither case are the burdens of current expenses being passed on to the taxpayers of future years.

---

[2] The petitioner at pp. 3 and 4 of his reply brief has provided tables, to which no objection has been taken, which illustrate the statistical predictability of state tax revenues as well as municipal real estate tax revenues.

Under the act and consistent with the facts stipulated to by the parties, the borrowings do not constitute public debt.

The amicus brief of Rep. David Prosser argues that Act 3 is unconstitutional because it improperly delegates legislative power. In *State ex rel. Wisconsin Inspection Bureau v. Whitman,* 196 Wis. 472, 505, 220 N.W. 929 (1928) this court discussed the limits of the legislature's authority to delegate its powers:

"The power to declare whether or not there shall be law; to determine the general purpose or policy to be achieved by the law; to fix the limits within which the law shall operate,—is a power which is vested by our constitution in the legislature and may not be delegated. When . . . the legislature has laid down the fundamentals of the law, it may delegate to administrative agencies the authority to exercise such legislative power as is necessary to carry into effect the general legislative purpose. . . ."

According to Rep. Prosser, Act 3 delegated to the governor, secretary to the department of administration, joint committee on finance, and state building commission the complete and unlimited authority to issue operating notes and to obligate the state within a stated period of time. Prosser contends that under the test outlined in *Whitman, supra,* the legislature has delegated too much because it has delegated the power to determine whether notes shall ever be issued; it has delegated the power to fix the limits, if any, within which the law operates; and it has delegated ultimate legislative power to a select group of legislators making up the joint finance committee.

This sweeping indictment of Act 3 does not withstand scrutiny. The legislature by Act 3 created a method of funding anticipated state operating deficits. The legislature did not, by this act, delegate any authority to any group to make law. The legislature only delegated to the

identified individuals, the authority to implement the purposes of the act by issuing operating notes in appropriate amounts. In *Watchmaking Examining Board v. Husar,* 49 Wis. 2d 526, 534, 182 N.W.2d 257 (1971) this court cited the *Whitman* case and stated:

"Later cases have stressed not the nature of the power delegated, but the reasonableness of consequent rules in light of the general legislative purpose, and, in addition, have stressed the necessity of procedural safe guards to prevent the abuse of delegated legislative power.

" . . .

"A delegation of legislative power to a subordinate agency will be upheld if the purpose of the delegating statute is ascertainable and there are procedural safe guards to insure that the board or agency acts within that legislative purpose." *Id.* at 534 and 536. *See, also In Matter of Guardianship of Klisurich,* 98 Wis. 2d 274, 280, 296 N.W.2d 742 (1980).

The purpose of Act 3 is clear: It authorizes under specified circumstances, issuance of operating notes to fund state operating deficits. The act contains sufficient internal safe guards and procedures to insure that the governor, secretary of the department of administration, joint finance committee, and the building commission act within such legislative purpose. Although no limit on the amount of operating notes that can be issued has been set by the legislature, it is clear from the act itself that the amount of operating notes cannot exceed the amount necessary to fund a readily ascertainable operating deficit. *See,* sec. 18.72(2), Stats. Furthermore, before the operating notes can be issued, a plan describing the specific nature of the proposed action including the amount of operating notes to be issued must be approved by the joint committee on finance of the legislature. Sec. 16.405(2). The act gives the department of administration discretion to request the issuance of operating notes

whenever it determines that a deficiency will occur in the funds of the state which will not permit the state to meet its operating obligations in a timely manner. This court has held that the legislature may delegate any power which it may itself rightfully exercise which is not legislative. *State v. Wakeen,* 263 Wis. 401, 407–09, 57 N.W.2d 364 (1953). Furthermore, the legislature may enact a statute which is dependent on the happening of a contingency fixed therein, and that contingency may consist of the determination of some fact, even if such fact is determined by private individuals. *Niagra of Wisconsin Paper Corp. v. Dept. of Natural Resources,* 84 Wis. 2d 32, 51, 268 N.W.2d 153 (1978). Here the department of administration's authority to request the issuance of the operating notes and the building commission's authority to adopt an authorizing resolution depends on a determination by the department that an operating deficit exists. Act 3 is not simply a broad legislative policy statement which leaves to the board or agency the task of fashioning regulations to effectuate that policy. *See, e.g., State ex rel. La Follette v. Reuter, supra.* Instead, the policy and purposes of Act 3 are clear and well defined. There are sufficient procedural safeguards in the act to ensure that the power to issue operating notes to fund state operating deficits is not abused. Under these circumstances, the act is not unconstitutional as an improper delegation of legislative power.

In view of the presumption of constitutionality which attaches to all legislation and the heavy burden of establishing unconstitutionality beyond a reasonable doubt, *see, School Dist. v. Marine Nat'l Exchange Bank, supra* at 403; *see also, State ex rel. Hammermill Paper Co. v. LaPlante,* 58 Wis. 2d 32, 47, 205 N.W.2d 784 (1973) and cases cited therein, and in view of the failure of the respondents' arguments to overcome that presumption, 1983 Wisconsin Act 3 must be held to be constitutional.

We declare that State of Wisconsin operating notes of 1983 when issued, sold and delivered in the manner provided by the authorizing resolution adopted by the state building commission pursuant to 1983 Wis. Act 3, will be valid contractual obligations of this state enforceable in accordance with their terms and the terms of the authorizing resolution.

WILLIAM A. BABLITCH, J., took no part.

LOUIS J. CECI, J., (*dissenting*). I dissent on one ground: By declaring 1983 Wisconsin Act 3 to be a valid, enforceable contractual obligation of the state, the majority has authorized a state debt, in violation of the state constitution. Article VIII, sec. 4 of the Wisconsin Constitution specifically provides that, "The state shall never contract any public debt except in the cases and manner herein provided." By holding that the operating notes are not public debt within the meaning of this constitutional prohibition, the majority has effectively undermined the purpose of this prohibition.

The majority states that the constitution does not define the term "public debt," but points out that the court has frequently defined the term in past cases. The majority refers to *State ex rel. Owen v. Donald,* 160 Wis. 21, 151 N.W. 331 (1915), to conclude that public debt has two components: (1) It must be an absolute obligation to pay money or its equivalent, and (2) the obligation is to be paid from money which is to be funded in the future, or, in other words, money that is not presently available. The majority concedes that the operating notes are clearly intended to be absolute obligations to pay money on the state's part, as the act in sec. 18.72(2), Stats., provides for purchasers' remedies against the

state.[1] Thus, the first element of public debt is present in 1983 Wisconsin Act 3. However, because the majority finds that these operating notes are to be paid from money in the "process of collection," the majority holds that the second element of public debt is missing from the act. It is with this holding that I disagree.

The majority initially relies upon *Donald* in its analysis of the second component of public debt. However, in that case, the court found the state's contract to purchase land for reforestation and water-power purposes constituted a public debt within the prohibitions of Wis. Const. art. VIII, sec. 4. This was based upon the fact that the agreements in the contract were "absolute promises to pay sums of money, fixed as to amount, *in praesenti*, with payments deferred and without reference to money in hand or equivalent." *Id.* at 61. In the instant case, I believe that the act authorizing the issuance of the operating notes is equivalent to the above contract in the *Donald* case. The operating notes represent absolute promises by the state to pay money in fixed amounts, and the money to be used for the payments is not "in hand."

In the *Donald* case, the court warned that:

"It may well be admitted that courts have been quite, and perhaps too, resourceful in discovering methods of so construing the term 'debts' and 'indebtedness' as to restrict the meaning thereof so as to meet the exigencies of particular cases." *Id.*

I believe that this is what the majority has accomplished by interpreting 1983 Wisconsin Act 3 as a valid, enforceable contractual obligation, in order to meet the exigency of the state's cash-flow imbalance. Like the *Donald* court, I submit that the safest way to avoid restricting

[1] *See, State ex rel. Warren v. Nusbaum,* 59 Wis. 2d 391, 428, 208 N.W.2d 780 (1973), and *Wisconsin Solid Waste Recycling Auth. v. Earl,* 70 Wis. 2d 464, 482, 235 N.W.2d 648 (1975).

the meaning of the word debt is to "cut quite loose from case law and look to the fair meaning of the constitution itself." *Id.*

The meaning of art. VIII, sec. 4 of the state constitution is quite clear. It succinctly states that, "The state shall *never* contract any public debt except in the cases and manner herein provided." (Emphasis added.) Concerning the historical background of the constitution, one author has stated the following:

"The delegates also displayed a horror of public debt. An obligation incurred must be met and the people must be taxed to pay it and within a short time after the debt was incurred. Then, as now, men looked askance at taxes. Traditionally in governments especially, those not responsible directly to the people, were engines of oppression and extortion. So, severe limitations were placed upon the power of the state Legislature to incurring public debts. They looked with horror on the idea of one generation imposing liability on the next. A limitation of $100,000.00 public debt was fixed and this debt had to be concurred in by a two-thirds vote of each house, with the imposition of a tax large enough to retire this debt in five years with interest." J. McGalloway, *Historical Background of the Constitution of Wisconsin,* Wis. Stat. Ann, Const, 1, 9 (West 1957).

As a result of this attitude, art. VIII, sec. 4 was drafted containing its specific prohibition against the creation of public debt, with the subsections following containing the exceptions to public debt and the limitations on such exceptions. The majority clearly has not found that the operating notes fall within the exceptions to public debt. Rather, the majority finds that the notes are not public debt, thereby ignoring the historical context of art. VIII and authorizing exactly that which the framers strove to guard against.

Further, the majority utilizes cases dealing with debts of *Municipalities* in order to determine whether or not

the operating notes are funded by "current revenues collected or in process of immediate collection." *Earles v. Wells,* 94 Wis. 285, 298, 68 N.W. 964 (1896). *See also, School Dist. v. Marine Nat. Exchange Bank,* 9 Wis. 2d 400, 101 N.W.2d 112 (1960). However, what the majority fails to grasp is that the constitution of Wisconsin originally contained *no limitation* on the borrowing capacity of municipal operations. *School Dist. v. Marine Nat. Exchange Bank,* 9 Wis. 2d at 404. Obviously, the framers were not as concerned with debts of municipalities as they were with debts of the state, or such a limitation would have been included at the time of the original drafting. In 1874, art. XI, sec. 3 of the constitution was amended to place the limitation upon municipal debts. *Id.* The majority cites to *State ex rel. Thomson v. Giessel,* 267 Wis. 331, 352, 65 N.W.2d 529 (1954), for its argument that because the terms "debt" and "indebtedness" as used in arts. VIII and XI of the constitution have the same meaning, indebtedness for municipalities and the state is the same. I am unable to make this leap, for the simple reason that the framers originally included no limitation for municipality debt, yet found it necessary to include an express bar upon state indebtedness, except in very extreme and well-delineated circumstances. Because of this very fundamental difference in the history of the two provisions, I believe that although the terms "debt" and "indebtedness" may be used in identical contexts, municipal and state debt are not the same and, thus, should not be treated identically. Therefore, I am unable to accept the majority's contention that municipal debt considerations should control in state debt issues.

Along this same line of reasoning, the majority refers to *Earles v. Wells,* 94 Wis. 285, to support its argument that the operating notes do not constitute public debt. However, *Earles* dealt with the issue of whether a municipality could contract for the construction of waterworks,

through authorizing the firm with which it contracted to issue bonds in order to raise money for the construction, for which the city was to be considered a party to the bond. In that case, the court stated that:

"So long as the current expenses of the municipality are kept within the limits of the moneys and assets actually in the treasury, and the current revenues collected or *in process of immediate collection,* . . . ."

No indebtedness had occurred, and the municipality could be regarded as doing business on a "cash basis." *Id.* at 298 (emphasis added). Once again, I submit that the majority opinion errs in applying this "cash basis" theory to the issue of state indebtedness. I believe this because it is clear to me that the framers had no such theory in mind when they drafted the constitution. Rather, they envisioned an absolute bar on the creation of state debt except in the express exceptions for which the framers provided. However, assuming *arguendo* that the debts of municipalities and the state should be treated identically, I believe that the majority further erred when it interpreted the language of the *Earles* decision dealing with the "cash basis" theory.

Initially, I would stress that as the *Earles* decision held that the ordinance in question was void because it exceeded the constitutional limitations, the court stated that:

"The method by which the attempt was made may be regarded as ingenious, but it should be remembered, . . . that the city could not do by indirection what it could not do directly." *Id.* at 299.

I believe that this is what the legislature has attempted to do in 1983 Wisconsin Act 3. It has created public debt, yet attempted to disguise it by stating that the notes are created for the purpose of funding state operating deficits or, in other words, to ease cash-flow imbalances,

sec. 18.71(4)(a), Stats., and are not public debt, sec. 18.71(4)(c). However, once the legislature is allowed to create such a debt, it can continue to create them in the future as it desires, and the constitutional prohibition becomes meaningless.

The majority has stated that because the operating notes are to be paid from money in the process of collection, they are not public debt. This rationale is based upon the language in the *Donald* case, which states that "money presently available or in process of collection and so treatable as in hand" does not constitute "debt." *State ex rel. Owen v. Donald,* 160 Wis. at 59. The *Donald* case cites the *Earles v. Wells* decision, which, as I have pointed out above, deals with "current revenues collected or *in process of immediate* collection." *Earles v. Wells,* 94 Wis. at 298 (emphasis added). The language concerning "the process of immediate collection" has been interpreted in numerous later cases; *see, School Dist. v. Marine Nat. Exchange Bank,* 9 Wis. 2d at 405; *Balch v. Beach,* 119 Wis. 77, 95 N.W. 132 (1903); and *Rice v. The City of Milwaukee,* 100 Wis. 516, 76 N.W. 341 (1898). In the *Marine* case, after citing from the *Earles* decision, the court concluded that the school district's budget included an amount sufficient to cover the debt in question, that the tax levy included such an amount, as did the "tax roll which ha[d] been delivered to the city treasurer with a warrant for collection." 9 Wis. 2d at 405. The *Marine* case also refers to the prior decision of *Balch v. Beach,* 119 Wis. 77. In the *Balch* case, the court interpreted "in process of immediate collection" to mean the following:

"Taxes in immediate process of collection do not include taxes merely voted. Taxes are not in immediate process of collection till the tax roll shall have been placed in the hands of the proper collecting officer with authority to receive, and with the right of the taxpayer to pay, the tax." *Id.* at 82.

In both the *Marine* case and the *Balch* case, it is clear that the funds were "in the process of immediate collection" because a tax roll had been delivered to the proper authority for collection. Tax roll is defined as:

"A schedule or list of the persons and property subject to the payment of a particular tax, with the amounts severally due, prepared and authenticated in proper form *to warrant the collecting officers to proceed with the enforcement of the tax.*" *Black's Law Dictionary* 1194 (5th ed. 1979). (Emphasis added.)

I believe that the funds to be used to reimburse purchasers of the operating notes issued pursuant to 1983 Wisconsin Act 3 are *not* "in the process of immediate collection." The secretary of administration does not have a form which authorizes the secretary to "proceed with the enforcement of the tax." Rather, the secretary is authorized to impound moneys of the general fund at *future* dates, sec. 18.75(4), Stats., with the final impoundment occurring on May 15, 1984. Such future impoundments do not constitute moneys "in hand" or "in the process of immediate collection." The *Marine* court, upon which the majority bases its holding, clearly states that when loans are made prior to the delivery of a tax roll to the treasurer with a warrant for collection of the taxes, indebtedness occurs. "The *anticipated revenues were not 'taxes in immediate process of collection'* . . ." 9 Wis. 2d at 406 (Emphasis added.) It is clear to me that the earlier cases contemplated tax rolls which could be proceeded upon immediately for collection of taxes, which must be delivered prior to the creation of the obligation upon the state. Under 1983 Wisconsin Act 3, the operating notes are issued and the obligation created prior to any impoundment by the secretary. Thus, the funds from which the principal and interest on these notes are to be repaid are not "taxes in the immediate

process of collection," but are merely "anticipated revenues."

Further, it appears that the majority is basing its holding upon dicta from *Rice v. The City of Milwaukee*, 100 Wis. 516. In the *Rice* decision, after referring to the *Earles* decision, the court held that liquor licenses to be paid in the future did not constitute funds in the process of collection. The court stated the following:

"[T]he moneys to be derived from these sources are entirely indefinite and uncertain. They were not in the process of collection, and could be collected only at the will of the parties who sought privileges for which license charges were made, and for that reason could not be considered as available assets or resources. The 'revenues' mentioned in [the *Earles*] decision had reference only to such revenues as the corporation had levied, and had a legal right to enforce, regardless of any one's [sic] will or pleasure." *Id.* at 521.

It appears that the language upon which the majority relies regarding "anyone's will or pleasure" is dicta, since the *Rice* court had decided that the taxes were not in the process of collection.

The final reason for which I feel the majority erred is in analogizing income, gift, inheritance, and sales tax revenues collected by the state to property tax revenues collected by the municipality. Article XI, sec. 3 of the Wisconsin Constitution reads as follows:

"...

"(2) No county, city, town, village, school district, sewerage district or other municipal corporation may become indebted in an amount that exceeds an allowable percentage of the taxable property located therein . . ."

Clearly, this constitutional provision contemplates loans based upon property taxes, which are fairly fixed and ascertainable from year to year. This fits within the rationale behind the strict circumstances set out in the above case law as to when loans may be made without

incurring indebtedness: Only when a tax roll for an ascertainable amount has been placed in the hands of the proper authority with the power to begin enforcement of the tax. I do not believe that this should be extended to encompass taxes such as gift, income, inheritance, and sales taxes, since, as the respondent has pointed out, these may vary from year to year and may depend upon contingencies which the state has no way of accurately predicting, such as the economy, number of people in the work force, etc.[2] Clearly, then, the revenues upon which the legislature has relied are not definite and certain within the *Rice* criteria. *Rice v. The City of Milwaukee,* 100 Wis. at 521.

Although the presumption of constitutionality attaches to 1983 Wisconsin Act 3 and the burden of establishing the unconstitutionality is beyond a reasonable doubt, I am unable to overcome the obstacles which I have stated in order to find the act constitutional. *State ex rel. Hammermill Paper Co. v. La Plante,* 58 Wis. 2d 32, 47, 205 N.W.2d 784 (1973). In conclusion, I believe that 1983 Wisconsin Act 3 authorizes an enforceable contractual obligation in violation of Wis. Const. art. VIII, sec. 4. I base this contention upon the grounds that municipal debt considerations should not be applied to state debt issues because of the historical contexts surrounding the two separate articles, and because of the actual structure of Wis. Const. art. XI, sec. 3, centering around property taxes. Also, even should one decide that state debt and municipal debt should be treated identically despite these considerations, I feel that the majority further erred by finding that the revenues utilized to fund the operating

---

[2] Respondents cite to the Annual Fiscal Report, State of Wisconsin, Department of Administration, 1981, for their argument that the revenues relied upon to fund 1983 Wisconsin Act 3 are "uncertain and speculative." They point out that in 1980–81, the state revenue projections erred by $157,966,019.

notes are "in the process of immediate collection." I do not believe that future impoundments of anticipated revenues may be reconciled with the court's past determinations of which taxes are in the process of immediate collection. For these reasons, I dissent.