Arthur T. DONALDSON, Plaintiff-Respondent-
Petitioner,

v.

BOARD OF COMMISSIONERS OF ROCK-KOSHKONONG LAKE
DISTRICT, Defendant-Appellant.†

Supreme Court

*No. 01–3396. Oral argument October 8, 2003.—Decided
June 9, 2004.*

2004 WI 67

(Also reported in 680 N.W.2d 762.)

† Motion for reconsideration filed.

CROOKS, J., dissents.
ABRAHAMSON, C.J. and BRADLEY, J., join.

For the plaintiff-respondent-petitioner there were briefs by *David C. Moore* and *Nowlan & Mouat LLP,* Janesville, and oral argument by *David C. Moore.*

For the defendant-appellant there was a brief by *William P. O'Connor, Mary Beth Peranteau* and *Wheeler, Van Sickle & Anderson, S.C.,* Madison, and oral argument by *William P. O'Connor.*

An amicus curiae brief was filed by *William J. Mulligan* and *Davis & Kuelthau, S.C.,* Milwaukee, on behalf of The Wisconsin Association of Lakes, Inc.

¶ 1. DAVID T. PROSSER, J. Arthur T. Donaldson (Donaldson) seeks review of a published decision of the court of appeals that reversed an order detaching Donaldson's two parcels of land from the Rock-Koshkonong Lake District (Lake District).[1] The Lake District is a public inland lake protection and rehabilitation district (lake district) under Wis. Stat. ch. 33 (2001–02).[2] This review requires us to (1) interpret Wis. Stat. § 33.33(3), which authorizes a property owner to seek detachment of "territory" from a lake district; and (2) address the scope of a circuit court's authority to review a lake district board's rejection of a detachment petition.

¶ 2. Donaldson asks that we reinstate the decision of the circuit court, which detached his "territory" from the Lake District on grounds that the evidence presented at the detachment hearing did not support a finding that Donaldson's two parcels were benefited by continued inclusion in the District. Conversely, the Board of Commissioners of the Rock-Koshkonong Lake District (the Lake District Board) asks that we affirm the court of appeals decision that a lake district board

---

[1] *Donaldson v. Bd. of Comm'rs of Rock-Koshkonong Lake Dist.,* 2003 WI App 26, ¶ 2, 260 Wis. 2d 238, 659 N.W.2d 66.

[2] All references are to the 2001–02 version of the Wisconsin Statutes unless otherwise indicated.

may detach property only if it finds there has been a change in circumstances since the formation of the district.

¶ 3. We conclude that Wis. Stat. § 33.33(3) accords a statutory right to petition the lake district board for an individual determination of whether specific "territory" is "benefited" by continued inclusion in the lake district.[3] This determination is separate and distinct from the legislative decision to create the district. There is no inherent conflict between a county board's decision to create a district with certain property in it and a lake district board's decision to detach a parcel from the district, because the lake district board's decision must address present circumstances, taking into account the lake district's past, present, and future activities in relation to that property. We therefore reject a rule that a petitioner must always demonstrate a change in circumstances before a lake district board is authorized to detach property.

¶ 4. We further conclude that a lake district board performs a legislative function when it considers whether to detach territory under § 33.33(3). Accordingly, a lake district board's detachment decision is presumed correct, and judicial review is limited to inquiring (1) whether the lake district board kept within its jurisdiction; (2) whether it proceeded on a correct theory of law; (3) whether its action was arbi-

---

[3] In Wis. Stat. § 33.33(3) the legislature uses the word "territory" to describe the land a petitioner seeks to detach from the lake district. This word is different from the word "property" in Wis. Stat. § 33.26, which is used to describe land included in a lake district at the time the district is created. In this opinion, we use the phrases "Donaldson's territory," "Donaldson's parcels," and "Donaldson's property" interchangeably. *But see* n.17, *infra.*

trary, oppressive, or unreasonable and represented its will and not its judgment; and (4) whether the evidence was such that the board might reasonably make the determination in question. When the board fails this review, the circuit court should remand the petition to the lake district board for action consistent with its decision.

¶ 5. Accordingly, we reverse the decision of the court of appeals and remand this case to the circuit court.

## I. FACTS AND PROCEDURAL HISTORY

¶ 6. The facts and procedural history are not in dispute. On June 10, 1999, the Rock County Board of Supervisors created the Rock-Koshkonong Lake District, consisting of land surrounding Lake Koshkonong and a portion of the Rock River. The Lake District consists of more than 4,000 parcels of land located within five towns in three counties (Dane, Jefferson, and Rock).[4] It describes itself as "the largest lake district in the State of Wisconsin." *See www.rkld.org* (Rock-Koshkonong Lake District website) (last modified April 5, 2004). When it created the Lake District, the Rock County Board found that "[t]he property included in the district will be benefited by the district's establishment." This is a prerequisite finding required by statute. *See* Wis. Stat. § 33.26(3).[5]

---

[4] *See* Wis. Stat. § 33.37 for a county board's authority to create a lake district in more than one county.

[5] Section 33.26(3) states:

> The committee shall report to the county board within 3 months after the date of the hearing. Within 6 months after the date of the hearing, the board shall issue its order under this subsection. If the board finds, after consideration of the

154

¶ 7. The Lake District includes two parcels of land owned by Donaldson. One parcel is located about one mile north of the Rock River, the other about one-half mile south of the Rock River. Donaldson's attorney filed a timely letter objecting to the formation of the lake district, as permitted by statute,[6] but did not seek judicial review after the district was formed.

¶ 8. On January 4, 2001, Donaldson petitioned the Lake District Board for detachment of his two properties.[7] On February 13, 2001, the Lake District Board held a public hearing to review his petition. A

> committee's report and any other evidence submitted to the board, that the petition is signed by the requisite owners as provided in s. 33.25, that the proposed district is necessary, that the public health, comfort, convenience, necessity or public welfare will be promoted by the establishment of the district, *that the property to be included in the district will be benefited by the establishment thereof,* and that formation of the proposed district will not cause or contribute to long-range environmental pollution as defined in s. 299.01(4), the board, by order, shall declare its findings, shall establish the boundaries and shall declare the district organized and give it a corporate name by which it shall be known. Thereupon the district shall be a body corporate with the powers of a municipal corporation for the purposes of carrying out this chapter. If the board does not so find, the board, by order, shall declare its findings and deny the petition. (Emphasis added.)

[6] Wisconsin Stat. § 33.26(1) states in relevant part: "Any person wishing to object to the organization of such district may, before the date set for the hearing, file objections to the formation of such district with the county clerk."

[7] Wisconsin Stat. § 33.33(3) provides:

> Territory may be detached from the district following petition of the owner or motion of the commissioners. Proposals for detachment shall be considered by the commissioners, and territory may be detached upon a finding that such territory is not benefited by continued inclusion in the district. Appeals of the commissioners' decision may be taken under s. 33.26(7).

transcript of the Board's evidentiary hearing was made part of the circuit court record.

¶ 9. At the hearing, Donaldson testified that his two parcels are not adjacent to any body of water, do not have access rights to Lake Koshkonong or the Rock River, and are not adjacent to any public access to those bodies of water. On the contrary, his parcels consist of agricultural land adjacent to an interstate highway. The only improvements on the land are three highway signs unrelated to Lake Koshkonong or the Rock River. Donaldson also testified that he did not believe the value of his land was enhanced by its proximity to Lake Koshkonong. He acknowledged that his property had not changed since the formation of the Lake District in 1999.

¶ 10. The only other person to testify was Steve Hjort, a biologist who serves as a consultant to the Lake District. He asserted that Donaldson's parcels are within the lower Koshkonong Creek sub-watershed, which is part of the Rock River watershed, meaning that surface water from his property drains into the Rock River. When asked about the boundaries of the Rock River watershed, Hjort explained that the watershed extends well beyond the established boundary of the Lake District, and that all land in Wisconsin is in some watershed. Hjort also stated that, based on the map he had in front of him, Donaldson's northern property was approximately one and one-half miles from the lake or river and two miles from the nearest public access site; the southern parcel was approximately one-half mile from the lake or river and one mile from the nearest public access site.

¶ 11. Although he did not testify, one of the Board commissioners, Jim Folk, took photographs of Donaldson's southern parcel to demonstrate that the

parcel was within the sightline of the Rock River. Folk's photos were admitted into evidence. Donaldson had testified that Lake Koshkonong was not visible from either of his parcels.

¶ 12. The Lake District Board continued the matter until its next meeting on March 13, 2001. At that meeting Buck Sweeney, a member of the Lake District Board who had not been present at the previous hearing, moved to deny the petition for detachment for the following reasons: (1) both tracts were within the original boundary of the district; (2) the Rock County Board's Resolution included a finding that the property within the Lake District will be benefited by the creation of the Lake District; (3) there was no evidence that there was a change in circumstances inconsistent with the initial finding that these tracts benefit from their inclusion in the Lake District; (4) both tracts are within the Rock River watershed and sub-watershed areas; (5) both tracts are located in near proximity to Lake Koshkonong and the portion of the Rock River within the Lake District; (6) although neither parcel is riparian, both tracts are located close to public boat launches; (7) the southerly tract has a direct view of the Rock River; (8) the value of both tracts will be enhanced if the water quality and recreational value of Lake Koshkonong and associated Rock River are improved and will be diminished if the lake or river were further degraded or if the Indianford Dam were removed; and (9) therefore, the parcels are benefited by continued inclusion in the Lake District.

¶ 13. The Board voted unanimously in favor of Sweeney's motion to deny Donaldson's petition.

¶ 14. Donaldson appealed to the Rock County Circuit Court, James E. Welker, Judge. This appeal was taken pursuant to Wis. Stat. §§ 33.33(3) and 33.26(7).

The defendant Board moved to dismiss the action on grounds that § 33.26(7) requires that a verified petition be made within 30 days of a lake district board's decision on detachment, and Donaldson's complaint, though within the 30–day period, was not verified. Shortly thereafter, Donaldson filed an amended complaint complying with the verification requirements.

¶ 15. Both Donaldson and the Lake District Board moved for summary judgment, and the circuit court held a hearing on June 13, 2001. On November 7, 2001, the circuit court granted judgment in favor of Donaldson and detached Donaldson's properties from the Lake District.

¶ 16. The Lake District Board appealed, contending that the circuit court erred in rejecting its argument that detachment requires a change in circumstances. The court of appeals agreed, reversing and remanding the matter for an order affirming the Lake District Board's decision to deny the petition. *Donaldson v. Bd. of Comm'rs of Rock-Koshkonong Lake Dist.*, 2003 WI App 26, ¶ 22, 260 Wis. 2d 238, 659 N.W.2d 66.

¶ 17. Because both parties treated Donaldson's action in circuit court as a request for certiorari review, the court of appeals employed the standard utilized in statutory certiorari cases. *Id.*, ¶ 10. Accordingly, the court of appeals presumed that the Lake District Board's decision was correct and limited its inquiry to "whether: (1) the board kept within its jurisdiction; (2) the board proceeded on a correct theory of law; (3) the board's action was arbitrary, oppressive or unreasonable and represented its will and not its judgment; and (4) the evidence was such that the board might reasonably make the order or determination in question." *Id.*

(quoting *Nielsen v. Waukesha County Bd. of Supervisors,* 178 Wis. 2d 498, 511, 504 N.W.2d 621 (Ct. App. 1993)).

¶ 18. In fact, the court of appeals focused exclusively on the second inquiry: whether the board proceeded on a correct theory of law. *Id.* It noted that the word "benefited" in § 33.26(3), governing the creation of lake districts, and the word "benefited" in § 33.33(3), the detachment provision, carry the same meaning. *Id.,* ¶ 12. The court of appeals reasoned that the Rock County Board had determined that Donaldson's property "benefited" by including it in the Lake District when it created the District, *id.,* ¶ 20, and Donaldson did not seek judicial review of that decision. In effect, then, the Lake District Board would be allowing Donaldson to circumvent the 30–day time period for appeal if it permitted detachment of his property without requiring him to show a change in circumstances. Thus, the court of appeals concluded that the Lake District Board applied the correct theory of law when it denied Donaldson's petition for detachment, inasmuch as Donaldson himself conceded that no circumstances had changed since the creation of the district. *Id.,* ¶¶ 20–21.

## II. ANALYSIS

A. Standard of Review

¶ 19. This case requires us to interpret and harmonize the provisions of Chapter 33. Statutory interpretation is a question of law that we review de novo. *Tri-Tech Corp. v. Americomp Serv.,* 2002 WI 88, ¶ 19, 254 Wis. 2d 418, 646 N.W.2d 822. The purpose of statutory interpretation is to determine what a statute

means so that it may be given the full, proper, and intended effect. *State ex rel. Kalal v. Circuit* Court, 2004 WI 58, ¶ 44, 271 Wis. 2d 633, 681 N.W.2d 110. We look first to the language of the statute. *N.E.M. v. Strigel,* 208 Wis. 2d 1, 7, 559 N.W.2d 256 (1997). If the language is ambiguous, even after examining such intrinsic factors as scope and purpose, we may consult extrinsic sources, such as legislative history, in an effort to divine legislative intent. *Kalal,* 271 Wis. 2d 633, ¶ 42. Differing interpretations of a statute do not necessarily create ambiguity, but equally sensible interpretations of a word or phrase indicate a statute's ability to support more than one meaning. *State ex rel. Angela M.W. v. Kruzicki,* 209 Wis. 2d 112, 122, 561 N.W.2d 729 (1997). "In construing statutes that are seemingly in conflict, it is our duty to attempt to harmonize them, if it is possible, in a way which will give each full force and effect." *City of Milwaukee v. Kilgore,* 193 Wis. 2d 168, 184, 532 N.W.2d 690 (1995).

¶ 20. In this case, it is not clear whether the word "benefited" is intended to carry the same meaning in Wis. Stat. §§ 33.001, 33.26(1) and (3), and 33.33(3); *see also* § 33.32. It is also uncertain what kind of review is intended in §§ 33.26(7) and 33.33(3). Consequently, we examine both intrinsic and extrinsic sources to help us construe the statute.

B. Lake District Powers

¶ 21. In 1974 the legislature created Chapter 33 of the statutes to afford additional protection to inland lakes. Ch. 301, Laws of 1973. The legislature declared that environmental values, wildlife, public rights in navigable waters, and the public welfare are threatened by the deterioration of public lakes. Wis. Stat. § 33.001. It found that protection and rehabilitation of public

inland lakes are in the best interest of the citizens as a whole and that the public welfare will be "benefited" thereby. *Id.* It noted that lakes form an important basis for the state's recreation industry and that increasing recreational use of public waters justifies state action to enhance and restore the potential of the state's inland lakes. *Id.* Therefore, the legislature concluded, "it is necessary to embark upon a program of lake protection and rehabilitation, to authorize a conjunctive state and local program of lake protection and rehabilitation to fulfill the positive duty of the state as trustee of navigable waters, and protect environmental values." Wis. Stat. § 33.001(2)(a).

¶ 22. In addition, the legislature found that local "districts should be formed by persons directly affected by the deteriorated condition of inland waters and willing to assist financially, or through other means, in remedying lake problems." Wis. Stat. § 33.001(2)(b). These lake districts are a significant component of Chapter 33's manifold approach to addressing the legislature's inland lakes objectives. They are corporate bodies with the powers of a municipal corporation, Wis. Stat. § 33.26(3), and each district may undertake "a program of lake protection and rehabilitation of a lake or parts thereof." Wis. Stat. § 33.21. The provisions governing the creation and activities of lake districts are designed to enable these special purpose districts to coexist among more traditional local governmental units.

¶ 23. A lake district's powers are set out in Wis. Stat. § 33.22. They include the power to sue and be sued, make contracts, purchase, lease or otherwise acquire property, disburse money, contract debt and do any other acts necessary to carry out a program of lake protection and rehabilitation. Wis. Stat. § 33.22(1). The

district may also create, operate and maintain a water safety patrol unit, enhance the recreational uses of the lake, including recreational boating facilities, and assume sanitary district powers. Wis. Stat. §§ 33.22(2m), 33.22(4m), and 33.22(3) and (4).

¶ 24. To finance these operations, the lake district has power to impose taxes and special assessments. First, the annual meeting may levy a uniform tax on all taxable property within the district. This tax to fund operations may not exceed a rate of 2.5 mills ($2.50 per thousand) of equalized valuation. Wis. Stat. § 33.30(4)(a).[8]

¶ 25. Second, because a lake district may borrow money, the district "shall levy an annual, irrepealable tax to pay the principal and interest" on its indebtedness. "The district shall levy the tax without limitation as to rate or amount on all taxable property within the district." Wis. Stat. § 33.31(3).

¶ 26. Third, the board of commissioners may impose special assessments "for the purpose of carrying out district protection and rehabilitation projects." Wis. Stat. § 33.32(1). After determining the entire cost of the

---

[8] Wisconsin Stat. § 33.30(4)(a) provides that the electors and property owners may, at the district's annual meeting,

> Vote by majority a tax upon all taxable property within the district. That portion of the tax that is for the costs of operation for the coming year may not exceed a rate of 2.5 mills of equalized valuation as determined by the department of revenue and reported to the district board. The tax shall be apportioned among the municipalities having property within the district on the basis of equalized full value, and a report shall be delivered by the treasurer, by November 1, by certified statement to the clerk of each municipality having property within the district for collection.

Wis. Stat. § 33.30(4)(a).

work to be done, the lake district board must apportion a special assessment "on a reasonable basis." *Id.* "In apportioning the special assessment, the commissioners shall examine each parcel and *determine the benefits to each parcel* from the project, considering such factors as size, proximity to the lake and present and potential use of the parcel, including applicable zoning regulations." Wis. Stat. § 33.32(1)(b) (emphasis added).

¶ 27. The potential scope of a lake district's operations, juxtaposed with the lake district's extensive taxing authority, may cause non-riparian property owners to be wary of large property tax bills and assessments. Special assessments *should* be tailored to reflect actual benefit to individual properties, but taxes to cover a lake district's indebtedness *will* be taxed at the same uniform rate, irrespective of whether properties are choice riparian or marginal non-riparian parcels.

¶ 28. At oral argument, the parties discussed the tensions that sometimes exist among owners of property within a lake district. Some riparian property owners favor high water levels, in part to promote recreation that will benefit their property; some riparian property owners favor lower water levels, perhaps because they have less interest in boating; and some property owners prefer to return a lake to its natural condition by removing any existing dam. When tensions exist within a lake district, factions may struggle to control the elected board to influence the policies and expenditures of the lake district. Non-riparians may watch these struggles, almost as bystanders, understanding that when elephants fight, the grass gets trampled.

¶ 29. In this case, there has been discussion about the Lake District's potential role in acquiring, operating, and maintaining the Indianford Dam, which is

presently owned by Rock County. *See* David W. Marcouiller, et al., University of Wisconsin-Extension, *Assessing Potential Economic and Ecological Impacts of Removing the Indianford Dam* 15 (Dec. 8, 1999); James E. Welker, Circuit Judge, Memorandum Decision 1 (Nov. 7, 2001) ("The impetus for the creation of the District was the potential for the removal of a small dam at Indianford.").

¶ 30. With this in mind, Donaldson petitioned to have his two properties removed from the District. He objected to the added layer of taxation that comes from being included in the Lake District, asserting that his properties are not benefited by the District because neither property is riparian or enjoys private access rights to the lake or river. He therefore sees no point in subsidizing activities that he contends serve only to benefit the Lake District's riparian owners.

¶ 31. A lake district board must consider a detachment petition and may detach property "upon a finding that such territory is not benefited by continued inclusion in the district." Wis. Stat. § 33.33(3). In this case, after a hearing, the Lake District Board turned down Donaldson's petition.

¶ 32. Section 33.33(3) also provides for "appeals of the commissioners' decision," which may be taken under § 33.26(7). Section 33.26(7) provides: "Any person aggrieved by the action of the board may petition the circuit court for judicial review. A verified petition shall be presented to the court," specifying the grounds upon which the appeal is based. Wis. Stat. § 33.26(7). Donaldson availed himself of this right. His ground for appealing was that the Lake District Board could not have reached the decision to deny his petition based on the evidence it received. The circuit court agreed and ordered Donaldson's property detached. As noted, the

court of appeals reversed, reasoning that Chapter 33's statutory scheme required a change in circumstances, a position strongly espoused by the Lake District Board. *Donaldson*, 260 Wis. 2d 238, ¶ 21. Because Donaldson conceded that the overall circumstances had not changed since his property was included in the District, the "petition for detachment was properly denied on the basis that he failed to show a change in circumstance." *Id.*

C. History of Inland Lakes Legislation

¶ 33. The 1974 legislation to promote the protection of public inland lakes grew out of a study conducted by the Legislative Council's Natural Resources Committee in 1972. The drafting file for the Legislative Council's bill, 1973 Assembly Bill 766,[9] makes clear that the drafters used existing law on town sanitary districts as the model for the creation of lake districts. The bill went through seven drafts before it was introduced, however, and these drafts reveal an evolution in concerns about protections for property owners and they show how the lakes bill differed from the sanitary district law.

¶ 34. To illustrate, the first draft of the lakes bill limited the land in the lake district to "frontage" land. It defined "frontage" as "lands fronting on a lake, having a direct access to the lake via artificial watercourses or having rights of access running with the lands." LRB-170/1:4. The explanation provided in the text of the draft stated: "The definition of 'frontage' is used in delimiting those lands in local lake renovation districts. It includes those lands having direct private access to

------

[9] 1973 Assembly Bill 766 became Chapter 301, Laws of 1973.

lakes; presumably, these lands will be specially benefited by any lake renovation project, and thus should directly bear part of the financial burden." LRB-170/1:4.

¶ 35. In this first draft, only persons owning frontage could petition to establish a lake district. LRB-170/1:6. An explanatory note read: "Governmental jurisdictions are included as eligible petitioners, since frontage owned by them will both be assessed for and benefited by reclamation activities undertaken by the district." In the bill's section on special assessments, the lake district commissioners were directed to "severally and separately consider each parcel of frontage therein and determine the benefits to each parcel and make assessments thereon." Any owner of a parcel of frontage who "feels aggrieved" by the assessment was authorized to "appeal" to the circuit court. "Such appeal shall be tried and determined in the same manner as cases originally commenced in said court."

¶ 36. In the first draft, there was no provision for a landowner to seek review of the county board's decision to include a parcel of frontage property in the lake district and no provision for a landowner to seek detachment of frontage property from the district.

¶ 37. By the third draft, the bill contained a provision permitting any person aggrieved by the county board's decision to create the lake district to petition the court for judicial review. LRB-170/3–10. The third draft still contained the delimiting language on "frontage."

¶ 38. The fourth draft retained the limitation to "frontage" and added the following explanation:

> The "frontage" definition also includes lands having direct access via natural streams flowing into or out of a lake. Determining whether any particular lands in

this class should be included in a district because of *direct* benefit is a question of fact, and is reserved to the county board for determination . . . .

LRB-170/4:7 (emphasis added).

¶ 39. The fifth draft dropped both the definition of and limitation to "frontage" land but added a provision on detachment, linking it to the appeal provision for establishment of the district. LRB 170/5:20. The draft also eliminated the explanatory note affirming the county board's broad fact-finding authority in creating a lake district.

¶ 40. When the bill was ultimately introduced, the explanatory note following the bill's section on "Merger, Annexation, Detachment" read:

> [The section] [p]rovides means of altering district boundaries. Merger is done by common consent of the governing bodies and members of both districts. Annexation proposals are measured against the same standards used for establishing the district, and are similarly appealable. Detachment proposals are decided upon the basis of whether the territory proposed for detachment is benefited by continued inclusion in the district.

LRB 170/7:29–30.

¶ 41. Although the lakes bill received extensive attention prior to its introduction, it remained controversial. Its legislative history after introduction includes 5 Substitute Amendments and 36 simple Amendments. *See* Legislative Council, *Digest of Council Bills in the 1973 Legislature* 65 (May, 1975). We see nothing in the legislative history of the statute that dictates a requirement that a property owner prove a change in circumstances to qualify for detachment. On the contrary, the detachment procedure assures that an ag-

grieved property owner will be able to secure an individual determination whether specific property is benefited.

## D. The Delegation of Legislative Authority

¶ 42. The Lake District Board contends that the creation of a lake district is an exercise of legislative power by a county board, and a decision on detachment is an exercise of legislative power by a lake district board. The Board emphasizes that an exercise of legislative power is subject to very limited judicial review. At a minimum, the Board argues, a property owner seeking a review of a decision on detachment must show a change in circumstances since the lake district was formed.

¶ 43. Because the statutes on town sanitary districts were used as a model for the lake district legislation, we believe that cases interpreting the sanitary district statutes are helpful in interpreting Chapter 33.

¶ 44. In *Fort Howard Paper Co. v. Fox River Heights Sanitary District,* this court reviewed a challenge to the creation of a town sanitary district. 250 Wis. 145, 26 N.W.2d 661 (1947). The standards then in place for a town to create a sanitary district resemble the conditions necessary for a county board to create a lake district.[10] Both require, among other things, that the appropriate body find that "the property to be

---

[10] *Compare* Wis. Stat. § 60.303(3) (1945) *with* Wis. Stat. § 33.26(3). Former Wis. Stat. § 60.303(3) provided:

Upon the hearing, if it shall appear to the town board after consideration of all objections, that the petition is signed by the requisite owners of real estate as provided in subsection (1) of section 60.302, and that the proposed work is necessary, and that the public health, comfort, convenience, necessity or public welfare will be promoted by the establishment of such district, and *the*

included in the district will be benefited by the establishment thereof." Wis. Stat. §§ 60.303(3) (1945), 33.26(3).[11] The focus in *Fort Howard* was on the scope of a circuit court's power to review the town board's determination that Fort Howard's property benefited from the establishment of the town sanitary district. The legislature had included a provision for an aggrieved party to bring an action in circuit court. Wis. Stat. § 60.304 (1945).[12] When Fort Howard brought such an action, the circuit court tried the issue as if there had been no prior decision by the town board, and

---

*property to be included in the district will be benefited by the establishment thereof,* the town board, by formal order, shall declare its findings and shall establish the boundaries and shall declare the district organized . . . .

Current Wis. Stat. § 33.26(3) provides:

If the board finds, after consideration of the committee's report and any other evidence submitted to the board, that the petition is signed by the requisite owners as provided in s. 33.25, that the proposed district is necessary, that the public health, comfort, convenience, necessity or public welfare will be promoted by the establishment of the district, that *the property to be included in the district will be benefited by the establishment thereof,* and that formation of the proposed district will not cause or contribute to long-range environmental pollution . . . , the board, by order, shall declare its findings, shall establish the boundaries and shall declare the district organized . . . .

[11] The contemporary counterpart to § 60.303(3) (1945) requires a town board to find, among other things, that "[p]roperty to be included in the district will be benefited by the district." Wis. Stat. § 60.71(6)(b).

[12] The current counterpart of this provision provides:

Any person aggrieved by any act of the town board or the department of natural resources in establishing a town sanitary district may bring an action in the circuit court of the county in which his or her lands are located, to set aside the final determination of the town board or the department of natural resources, within 90 days after the final determination, as provided under s.

determined that Fort Howard's property did not benefit from being in the town sanitary district and excluded it from the district. *Fort Howard,* 250 Wis. at 149.

¶ 45. On appeal, this court concluded that the power to establish a town sanitary district had been delegated to the town board by the legislature. *Id.* at 149–50. Thus, the circuit court erred by reviewing de novo and under its own standards whether the property would "benefit." *Id.* at 151. We said that a court's powers of review were quite limited. *Id.* at 150.

¶ 46. The *Fort Howard* decision requires close analysis. The statute in place at the time stated that "if it shall appear to the town board after consideration of all objections, that . . . the public health, comfort, convenience, necessity or public welfare will be promoted by the establishment of such district, and the property to be included in the district will be benefited by the establishment thereof," the board shall declare its findings, establish the boundaries, and declare the district organized. Wis. Stat. § 60.303(3) (1945).

¶ 47. The right of a property owner thereafter to appeal the board's decision to circuit court was limited. Wis. Stat. § 60.304 (1945). The statute authorized an action "*to set aside* the action of the board" (emphasis added). The statute went on: "Unless action is so taken [within the required time period], the determination by the town board shall be conclusive." *Id.*

¶ 48. As a general proposition, we noted that "the court may not exercise legislative power." *Fort Howard,* 250 Wis. at 150.

---

893.73(2). If no action is taken within the 90–day period, the determination by the town board or the department of natural resources is final.

Wis. Stat. § 60.73.

The question here is to what extent has the court power to review the action of a body exercising legislative power. By sec. 60.301, Stats., the legislature delegated to the town board the power to establish a town sanitary district. The power thus delegated to the town board being legislative in its character, cannot be exercised by a court.

*Id.*

¶ 49. The court then appeared to step back somewhat, saying that *"unless otherwise provided by statute,"* the power of the court "is limited in the review of legislative orders to inquire as to:"

> (1) the validity of the statute under which the legislative body acts; (2) whether the legislative body proceeded in accordance with the provisions of law and within its jurisdiction; (3) whether the legislative body acted arbitrarily, capriciously or oppressively. If the town board acted without evidence sufficient to support its findings it acted arbitrarily.

*Id.* at 150 (emphasis added).

¶ 50. Did the statute's reference to the town board's determination that "the property to be included in the district will be benefited by the establishment thereof," imply additional review powers for a court? Not in that case, the court said. The statute did not require the town board to keep a record of its proceedings. *Id.* "In the absence of such a record, it must be presumed that the town board acted upon sufficient evidence to sustain its findings as there is nothing in the record to indicate the contrary." *Id.* at 150–51. The court further explained that the town was not expected to focus on the benefit to individual properties:

> The statute does not provide that if any piece or parcel of land included within the boundaries of the proposed district shall not be benefited, the district shall not be

171

organized. If the town board finds that the property within the boundaries of the proposed district as a whole will be benefited then the district is to be organized. . . . If all the property within the boundaries of the proposed district is in the watershed and the proposed improvement may serve it, then the property of the district as a whole is benefited and the town board if it makes the other necessary finding may organize the district. The organization of a sanitary sewer district is in the interest of the public health. Such a district cannot be organized unless the town board finds from the evidence that the public health, comfort, convenience, necessity, and public welfare will be promoted thereby. That is the benefit that is meant by the statute.

*Id.* at 152.

¶ 51. The *Fort Howard* case stands in part for the proposition that courts are prohibited from substituting judicial judgment as to good public policy for legislative judgment. *Id.* at 150. In the *Fort Howard* circumstances, "Fixing the limits of the proposed district is within the discretion of the town board, which discretion the court has no power to review. The order must be set aside or affirmed in toto." *Id.* at 151.

¶ 52. As a general principle, whether a particular unit of government should be created involves the best interest of the community and is therefore a matter of "public policy and statecraft." *See, e.g., In re Incorporation of Village of North Milwaukee,* 93 Wis. 616, 624, 67 N.W. 1033 (1896); *see also Town of Pleasant Prairie, Kenosha County v. Department of Local Affairs and Development,* 113 Wis. 2d 327, 343, 334 N.W.2d 893 (1982); *Town of Beloit v. City of Beloit,* 37 Wis. 2d 637, 646–47, 155 N.W.2d 633 (1968); *Scharping v. Johnson,* 32 Wis. 2d 383, 388, 145 N.W.2d 691 (1966) ("The

172

creation of municipal corporations is peculiarly within the province of the legislature."). As we have stated in the parallel context of municipal annexation:

> What is "desirable," or "advisable" or "ought to be" is a question of policy, not a question of fact. What is "necessary," or what is "in the best interest" is not a fact and its determination by the judiciary is an exercise of legislative power when each involves political considerations and reasons why there should or should not be an annexation. This is the general and universal rule which sharply draws the differentiating line between legislative power and judicial power and by which the validity of the delegation of functions to the judiciary by the legislature is determined.

*City of Fond du Lac v. Miller,* 42 Wis. 2d 323, 329, 166 N.W.2d 225 (1969), (citing *Town of Beloit,* 37 Wis. 2d at 644).

¶ 53. We are constrained to believe that the same principles apply when a court reviews the action of a county board in creating a lake district. The dynamics of lake district creation are such that a county board is likely to look at the big picture, that is, whether the proposed lake district will serve the public interest as a whole and whether the properties to be included in the district will be benefited as a whole.[13] In these circum-

---

[13] When a county board determines that the property within the district *as a whole* will be benefited by the formation of the district, its broad finding necessarily includes a determination that each parcel in the district will be benefited, and that finding is presumed to be correct. But a presumption of correctness goes only so far in the absence of an individual determination. In reality, a county board may do nothing more than rubberstamp a petition and parrot the words required by statute. The record does not indicate whether the Rock County

173

stances, judicial review is almost necessarily limited to whether the county board followed proper procedures in establishing the district and whether the board's action with respect to an individual property or group of properties was so arbitrary, oppressive, or unreasonable that it jumps out to the observer without additional evidence.[14]

¶ 54. Of course, a property owner who does not wish a certain parcel to be included in a proposed lake district may be able to persuade the county board to consider that parcel individually and remove it from the district, or to consider the parcel individually and provide an explanation of why that parcel is benefited. If the latter determination is made, it will be very hard to challenge on appeal, and hard to challenge in a subsequent detachment petition, absent a change in circumstances.

E. Tension Between Lake District Formation and Detachment Procedures

¶ 55. We are concerned in this case with the Lake District Board's determination not to detach property, not the Rock County Board's decision to form the District. Both parties admit to a certain tension in the statutes because each board, at different points in time, decides whether property is "benefited" from inclusion in the lake district. Our task is to resolve the tension between language in Wis. Stat. § 33.26(3), governing

---

Board of Supervisors made any changes in the boundaries of the lake district proposed in the petition.

[14] *Ross v. Honey Lake Protection and Rehabilitation District,* 166 Wis. 2d 739, 746, 480 N.W.2d 795 (Ct. App. 1992), emphasizes that actions challenging a county board's *creation* of a lake district must be brought within the statutory 30–day time limit. Wis. Stat. § 33.26(7).

the formation of lake districts, and language in § 33.33(3), authorizing the detachment of territory from lake districts.

■

¶ 56. We agree with the Lake District Board that the decision to detach territory from a lake district is, like the decision to form a lake district, an exercise in legislative power.[15] Consequently, judicial review is circumscribed. Nonetheless, there are important differences between judicial review of the creation decision by a county board and judicial review of the detachment determination by the lake district board.

¶ 57. First, the 1974 lake district legislation created a detachment mechanism that was not present in the town sanitary district law.[16] There was a reason for doing so. As we observed in ¶ 39 above, the detachment

[15] The jurisprudence relating to school district reorganization, which includes detachment of property from one school district followed by reattachment to another district, is instructive. In *Joint School District No. 1 of the Town of Wabeno v. State,* 56 Wis. 2d 790, 203 N.W.2d 1 (1973), we stated that "school district reorganization is a legislative policy-making function, which the legislature has delegated to local boards and to the state superintendent of public instruction." *Id.* at 794 (collecting cases).

[16] Sanitary districts did not have a removal provision until 1987. In *Haug v. Wallace Lake Sanitary District,* 130 Wis. 2d 347, 387 N.W.2d 133 (Ct. App. 1986), the court of appeals decided a case brought by several residents of a sanitary district who complained that they were being assessed for a sanitary sewer system from which they received no service. The residents contended that the town had authority to redefine the boundaries of the district without dissolving the district, permitting them to get out. The court of appeals disagreed. Shortly thereafter, the legislature enacted the removal provision in Wis. Stat. § 60.785(1m). Act 77, Laws of 1987.

175

procedure appeared in the draft legislation at the same time the language limiting the property that could be included in the district was taken out. The term "frontage" may have been viewed as too limiting, but its removal effectively erased all limits. Thus, we believe it is a fair inference that the detachment procedure was designed as a necessary safeguard for property owners—to discourage overreaching by the proponents of a lake district and to assure that an aggrieved property owner would be able to secure an individual determination of whether a specific parcel is benefited.

¶ 58. Second, the "benefited" language in § 33.26(3) is not the same as the "benefited" language in § 33.33(3). A county board determines "that the property to be included in the district *will be benefited* by the establishment" of the district. Wis. Stat. § 33.26(3) (emphasis added). This finding is both general and predictive. In the absence of an individualized determination, a county board is making a rough approximation of benefit to all properties in the district as the county board looks to the future. By contrast, a lake district board must decide whether "*such* territory *is not* benefited by *continued* inclusion in the district." Wis. Stat. § 33.33(3) (emphasis added).[17] This determi-

---

[17] We also note that the legislature chose a different word to describe the large mass of real estate proposed for inclusion in the district and the individual parcels that are likely to come before a lake district board for detachment. In the former instance, the legislature opted to use the term "property," but in the latter detachment provision the legislature chose the word "territory." While neither of these words is used with precision in the statutes, the differing formulations for the same concept suggest that the legislature did not intend complete identity between the two proceedings. If it had so intended, the legislature would have used the same language in both.

nation requires an individualized evaluation of property under present circumstances.[18] A lake district board may utilize hindsight and foresight as it makes its fact-based detachment determination on an individual parcel. The commissioners are aware of both past and present activities of the lake district, and, as such, can intelligently ascertain whether a property initially included in the district is currently benefited and will continue to benefit from the district. The district board is uniquely situated to assess whether activities slated for future implementation will benefit a particular piece of property.

¶ 59. By closely examining the two statutes, we conclude that it is not always necessary for the petitioner in a detachment proceeding to prove that there has been a change in circumstances. When there has been no individualized determination of benefit to property by the county board, there is a presumption that the board made a reasonable decision, but this presumption is not *conclusive* in a future detachment proceeding. In other words, the county board's decision normally does not settle the issue of benefit to individual property. As noted above in ¶ 40, the Legislative Council described the distinction between the test for annexation to a lake district and the test for detachment from a lake district: "Annexation proposals are measured against the *same standards used for estab-*

---

[18] A lake district board's individualized determination of whether a specific parcel is or is not benefited by continued inclusion in the lake district might be characterized as a quasi-judicial determination, rather than a legislative determination. We decline to pursue this point, urging instead that the legislature establish additional standards for lake district boards.

*lishing the district,* and are similarly appealable. Detachment proposals are decided upon the basis of whether the territory proposed for detachment is benefited by continued inclusion in the district." LRB 170/7:29–30 (emphasis added). The framers of the legislation explicitly recognized a distinction between one determination and the other. Consequently, a lake district board's duty to render an individualized determination as to present benefit to a specific parcel cannot be satisfied by relying solely on the decision previously made by the county board, unless the county board made an individualized determination *and* nothing has changed.

¶ 60. At oral argument, counsel for the Lake District asserted that the legislature has imposed no standards at all to guide a lake district as it exercises legislative power on the issue of detachment. This is not correct. The legislature's findings and declaration of intent are not irrelevant. They include statements (1) that "the protection and rehabilitation of the public inland lakes of this state are in the best interest of the citizens of this state; [and] the public health and welfare will be *benefited* thereby," and (2) lake "districts should be formed by persons *directly* affected by the deteriorated condition of inland waters." Wis. Stat. § 33.001(1) and (2)(b) (emphasis added). A lake district board ought to be able to articulate why property included in the lake district and subject to its added layer of taxation is more directly benefited by inclusion in the district than thousands of parcels in the vicinity that are not included in the district.[19]

---

[19] We also note that the detachment decision may precede or coincide with a hearing contesting a special assessment. A special assessment hearing explicitly requires commissioners to

¶ 61. In short, there are factors besides whether there has been a change in circumstances that a conscientious lake district board must take into account.

¶ 62. In this case, the Rock-Koshkonong Lake District went beyond the statute, adopting procedures and criteria for the consideration of detachment petitions. One of the reasons for adopting these criteria was to promote consistency. Resolution 99–03 (A-123). The Lake District's procedure anticipates that a petitioner will provide a "statement explaining why the property should be removed from the District." The petitioner may present testimony and evidence relevant to whether specific property is not benefited by continued inclusion in the District. *Id.* at II(A). The commissioners may question any witness, including the property owner, *id.* at II(B), and the Board may consider:

A. The physical characteristics of the property.

B. Its use (recreational, commercial, residential, etc.).

C. Its relationship to the lake in terms of whether:

 1. It is riparian;

 2. It has private access rights to the lake;

 3. Its proximity to public access to the lake;

 4. It is within view of the lake; and

---

"examine each parcel and determine the benefits to each parcel from the project, considering such factors as size, proximity to the lake and present and potential use of the parcel, including applicable zoning regulations." Wis. Stat. § 33.32(1)(b). Commissioners must be able to explain why property is benefited by inclusion in the lake district if they intend to impose special assessments on that property.

5. It is within the watershed or ground water table of the lake.

D. Whether the value of the property would be enhanced if the lake were to be in reasonably clean, attractive and usable condition; or whether the value of the property would be diminished if the lake were to be in a degraded condition.

E. Whether detachment of the property will result in any "hole" or "island" in the boundaries of the District.

F. Whether circumstances surrounding the property's inclusion in the District have changed.

G. Any other factors relevant to whether the property is benefited by continued inclusion in the District.

*Id.* at A-124, III Criteria. Surely, the "relevant" factors the Board ought to address include the factors set out by the petitioner in making the case for detachment.

¶ 63. Having established criteria to consider, a lake district board should not look solely to those criteria that support its position and disregard criteria that do not, because a lake district must avoid arbitrary and capricious action. "Arbitrary action is the result of an unconsidered, wilful and irrational choice of conduct and not the result of the 'winnowing and sifting' process." *Olson v. Rothwell,* 28 Wis. 2d 233, 239, 137 N.W.2d 86 (1965). Arbitrary action represents a board's will and not its judgment. The fair and consistent

180

application of reasonable rules will blunt a detachment petitioner's claims that a lake district board has been arbitrary.

¶ 64. It should be noted that if property is detached, the detachment is not irrevocable. If a lake district undertakes a project that will benefit property that has been detached, or if the property itself changes, the lake district board may initiate proceedings to re-attach the property to the district.

¶ 65. Review of a detachment determination does not permit a court to substitute its judgment for the considered judgment of a legislative body. However, the statute empowers the court to assure that the lake district board actually makes an individualized determination of whether a parcel is or "is not benefited by continued inclusion in the district," *see* § 33.33(3), and permits a court to address a plainly erroneous exercise of discretion.

¶ 66. In this opinion we do not attempt to set forth standards for determining whether property is or is not benefited by continued inclusion in a lake district. This is legislative work. Our objective is to encourage the development of reasonable standards by lake district boards and the legislature, and to assure adherence to standards when they exist, so as to promote fairness, consistency, and sound public policy.

F. Review of Detachment Decisions

¶ 67. Both the circuit court and the court of appeals assumed that this action was governed by the review principles of statutory certiorari, and they conducted their analyses accordingly.

¶ 68. The legislature did not make clear what kind of hearing it intended for an appeal under § 33.26(7). It imposed no requirement that a county board conduct an evidentiary hearing on objections to a lake district or make a record of its decision other than a resolution creating the lake district with certain required findings. Likewise, it imposed no requirement for an evidentiary hearing when a lake district board considers a detachment petition. Yet the legislature did not authorize a circuit court, on appeal, to take additional evidence in either situation.

¶ 69. Wisconsin Stat. §§ 33.26(7) and 33.33(3) each afford an aggrieved party a *right* to appeal. This implies that the decision to grant review is not discretionary with the court, and that suggests statutory certiorari.

¶ 70. In *Stacy v. Ashland County Department of Public Welfare,* 39 Wis. 2d 595, 601, 159 N.W.2d 630 (1968), we examined the question of review by certiorari where *no provision* was made for a review of a decision by a board or commission. We concluded that where there are no statutory provisions for judicial review, the action of a board or commission may be reviewed by way of certiorari. *Id.* The situation in *Stacy* is somewhat analogous to the situation here.

¶ 71. Although § 33.26(7) does not mention "certiorari," it does use the words "petition" and "appeal." In the absence of any additional grant of authority to the court, we believe the words of the statute imply that the court is largely confined to a previously existing record. *See Nielsen v. Waukesha County Bd. of Supervisors,* 178 Wis. 2d 498, 521, 504 N.W.2d 621 (Ct. App. 1993). This view is supported by comparing a § 33.26(7) hearing to a § 33.32(1)(f) hearing, which is utilized for a challenge

to an assessment.[20] The latter hearing appears to contemplate more than a review of existing evidence.

¶ 72. In *Lakeshore Development Corp. v. Plan Commission,* 12 Wis. 2d 560, 107 N.W.2d 590 (1961), the court explained that:

> The writ of certiorari at common law was limited in scope and . . . usually raised only questions of jurisdiction or excess power set forth as errors in the petition . . . The return was taken as conclusive if responsive to the petition and could not be impeached by collateral affidavits. . . .
>
> The scope and purpose of the writ of certiorari has been enlarged by statute and it is now used as a method of appeal to determine not only the jurisdiction of a municipal board . . . but also to review the action of such a board as arbitrary, unreasonable, or discriminatory and sometimes to decide the merits of the action.

*Id.* at 565.

██

¶ 73. We do not perceive any authority for a court to decide de novo the merits of an action in detachment. We see review based on inquiry as to (1) whether a lake district board kept within its jurisdiction; (2) whether it proceeded on a correct theory of law; (3) whether its action was arbitrary, oppressive, or unreasonable and represented its will and not its judgment; and (4) whether the evidence was such that the board might reasonably make the determination in question.

---

[20] Wisconsin Stat. § 33.32(1)(f) provides in part: "Such appeal shall be tried and determined in the same manner as cases originally commenced in said court."

## G. Donaldson's Petition for Detachment

¶ 74. The statute on detachment requires a lake district board to make an individual determination whether specific property is or is not benefited by continued inclusion in the lake district. The petitioner has the burden of persuading the board and creating a record. A petitioner should (1) clearly state the grounds for detachment; (2) append documents, whenever possible, that tend to support these grounds; and (3) request the opportunity to testify and present evidence. The district board must respond by setting out the rules and procedures it intends to follow, and eventually it must marshal arguments and evidence to support its decision.

¶ 75. Under principles of certiorari review, the circuit court is limited to the facts contained in the record from the proceeding under review, unless a statute expands the scope of review.[21] This principle is somewhat difficult to apply when a lake district board makes findings that go beyond the evidence adduced at the hearing, because the petitioner will not have had notice of the need to address this evidence.

¶ 76. A court is not powerless in the face of an inadequate record. If the record is inadequate because the petitioner failed to make a compelling case or failed to make a compelling offer of proof, the petitioner should lose. If the record is inadequate because the lake district did not permit the petitioner to present evidence, the lake district board would violate the spirit if

---

[21] *See, e.g.,* Wis. Stat. § 59.694(10) (authorizing the court to take additional evidence in a review of a decision by a board of adjustment).

not the letter of the detachment statute and would subject itself to due process review.

¶ 77. In this case, Arthur Donaldson testified, a consultant to the District testified, and one of the commissioners submitted photographs. Consequently, the Rock-Koshkonong Lake District Board cannot be faulted for any failure to permit Donaldson to present evidence. However, the Lake District Board did make findings that went beyond the evidence presented at the hearing.

¶ 78. We now examine the record under the standards for statutory certiorari.

¶ 79. The first component of certiorari that we review here is whether the District acted according to law. "Law" refers not only to the applicable statutes but also to the guaranties of due process found in the state and federal constitutions. *State ex rel. Wasilewski v. Bd. of Sch. Dirs.,* 14 Wis. 2d 243, 263, 111 N.W.2d 198 (1961), (citing *State ex rel. Ball v. McPhee,* 6 Wis. 2d 190, 199, 94 N.W.2d 711 (1959)).

¶ 80. The court of appeals focused on the question whether the lake district board acted according to law and concluded that it did: "Donaldson's petition for detachment was properly denied on the basis that he failed to show a change in circumstance." *Donaldson,* 260 Wis. 2d 238, ¶ 21. Because we conclude that this is not a correct statement of law in a situation where the county board has not made and articulated an individual determination of benefit to the petitioner's property, we reverse the court of appeals.

¶ 81. The Lake District Board also relied on this principle. The Board's first three reasons in support of its conclusion relate to its premise that the county

board made a legislative decision to include property in the district because such property will be benefited by inclusion in the district. Thus, according to the Board, the Lake District Board not only had no obligation to second-guess the county board about any of this property but also should *not* have second-guessed the county board about this property, *in the absence of a change of circumstances.* We reject this premise as inconsistent with the statutory scheme. Except in those rare instances in which a county board takes the time to address individual parcels and articulates the basis for a finding that these parcels will be benefited by inclusion in the district, the lake district board is expected to make its own determination whether each parcel is or is not benefited by continued inclusion in the district. Thus, the Board relied in substantial part on an incorrect theory of law.

¶ 82. Looking to another legal issue, we note that in *State ex rel. Riley v. Department of Health & Social Services,* 151 Wis. 2d 618, 445 N.W.2d 693 (Ct. App. 1989), the court of appeals stated:

> On certiorari review, we determine *de novo* whether the department . . . acted according to applicable law, whether the action was arbitrary or unreasonable, and whether the evidence supported the determination . . . *An important component of the analysis is whether the department followed its own rules, "for an agency is bound by the procedural regulations which it itself has promulgated."*

*Id.* at 623 (emphasis added).

¶ 83. This analysis is inapposite in reviewing a pure exercise of legislative power. "Courts are reluctant to inquire into whether the legislature has complied with legislatively prescribed formalities in enacting a

statute. This reluctance stems from separation of powers and comity concepts." *State ex rel. La Follette v. Stitt,* 114 Wis. 2d 358, 364–65, 338 N.W.2d 684 (1983).

> [C]ourts generally consider that the legislature's adherence to the rules or statutes prescribing procedure is a matter entirely within legislative control and discretion, not subject to judicial review unless the legislative procedure is mandated by the constitution. If the legislature fails to follow self-adopted procedural rules in enacting legislation, and such rules are not mandated by the constitution, courts will not intervene to declare the legislation invalid.

*Id.* at 365.

¶ 84. Although the Lake District Board adopted criteria to consider in reviewing a detachment petition, it did not make the consideration of these criteria mandatory. Consequently, we do not see a due process violation in the Board's failure to discuss each of the relevant criteria. Rather, we consider the Board's failure to discuss all the relevant criteria under a different component of certiorari review.

¶ 85. The second component of certiorari review in this case is whether the Board's decision was arbitrary, oppressive, or unreasonable, representing its will and not its judgment.

¶ 86. In Resolution 99–3, the Lake District Board listed *seven* criteria that it might "consider" in reviewing a detachment petition. In reviewing Donaldson's petition, the Lake District Board enumerated *eight* "reasons" why it concluded that "the territory is benefited by continued inclusion in the District."

¶ 87. Three of the "reasons" stated by the Board relate to *one* of the seven criteria; namely, "F. Whether circumstances surrounding the property's inclusion in

187

the District have changed." This was discussed in ¶¶ 59 and 81 above and found to be legally incorrect on the facts of this case.

¶ 88. The Lake District Board did not discuss four of the seven criteria, namely "A. The physical characteristics of the property," "B. Its use (recreational, commercial, residential, etc.)," "E. Whether detachment of the property will result in any 'hole' or 'island' in the boundaries of the District," and "G. Any other factors relevant to whether the property is benefited by continued inclusion in the District." Each of these criteria tends to support Donaldson's position. His two parcels consist of agricultural land near an interstate highway. They are zoned agricultural. They are used for agriculture, and Donaldson said he has no intention to change their use. There are no improvements on the parcels except for highway signs, and no one lives on these parcels. Detachment of the two parcels would not create any holes in the District. The District did not discuss "other" relevant factors or rebut Donaldson's arguments directly.

¶ 89. This leaves two of the seven criteria that the Board itself listed as factors for consideration. The Board's third criterion, "C," reads as follows:

C. [The land's] relationship to the lake in terms of whether:

1. It is riparian;

2. It has private access rights to the lake;

3. Its proximity to public access to the lake;

4. It is within view of the lake; and

5. It is within the watershed or groundwater table of the lake.

Criterion "C"—which specifically refers to "lake"—is the source of four of the Board's eight "reasons" for finding that Donaldson's parcels are benefited.

¶ 90. The Board states that both tracts are in "near proximity" to Lake Koshkonong "and the portion of the Rock River within the District." The "northerly tract" is located approximately one mile from the Rock River; the "southerly tract" is located approximately a half-mile from the Rock River. Significantly, the Board does not indicate the distances between the two parcels and Lake Koshkonong. Instead, it shifts focus, citing distances to the Rock River because Donaldson's parcels are closer to the river than to the lake. By doing so, the Board turns Donaldson's argument on its head, using the distances he cited to establish that he is *not* benefited as proof that his parcels are in "near proximity" to the river.

¶ 91. In reviewing the Board's "near proximity" rationale, we cannot say that a legislative finding that property located one mile from a lake is "benefited" by its proximity, is an irrational finding. Similarly, we would have difficulty dismissing out of hand a legislative determination that property located five miles from a lake or river is benefited by its proximity. What is evident in this case, however, is that the Lake District has no consistent rationale about proximity. The Lake District Board has not established a consistent standard for determining "near proximity," has switched from lake to river in its analysis, and has not explained how non-riparian agricultural land located a half-mile or a mile from the *river* is benefited by its proximity more directly than many similar parcels not included in the District and not subject to its added layer of taxation.

189

¶ 92. In 1999 the University of Wisconsin Extension did a study on the potential impacts of removing the Indianford Dam. *See* David W. Marcouiller, et al., University of Wisconsin-Extension, *Assessing Potential Economic and Ecological Impacts of Removing the Indianford Dam* (Dec. 8, 1999). The study focused on the towns of Albion, Milton, Sumner, and Koshkonong. It did not study the town of Fulton in which Donaldson's properties are located, presumably because Fulton has no riparian property on Lake Koshkonong. In the course of their analysis, the investigators indicated that they studied property within a half-mile of Lake Koshkonong. "In general, there is a rough overlap between the identified parcels within 1/2 mile and [the] newly created lake district." *Marcouiller, supra,* at 22. The investigators acknowledged that "the boundaries do not match exactly" with their half-mile calculation. However, most property in the district appears to be *within* a half-mile of the *lake.*

¶ 93. When property is a half-mile or more from the *river,* is not riparian, and has no private access to the lake or river, the benefit derived from "proximity" is not so self-evident that it requires no explanation in a detachment decision. In this case, the Board failed to link proximity to benefit.

¶ 94. The Board gave another "reason" for opposing detachment. It stated: "Both tracts are within the Rock River watershed and within the sub-watershed areas that drain into portions of the Rock River and Lake Koshkonong within the boundaries of the District." Judge Welker addressed this reason, saying: "There is a very great deal of land in Rock County [as well as Jefferson and Dane Counties] which is within

the Rock River watershed or drains into the Rock River or Lake Koshkonong which is not included in the District."

¶ 95. Under cross-examination, the Board's witness, Steve Hjort, acknowledged that all land in Wisconsin is within some watershed. Consequently, the fact that property is located in a watershed or subwatershed tells us very little about how that property affects a lake or river or how that property is benefited by inclusion in a lake district. Again, the Lake District Board provides a fact without showing how that fact is relevant to benefit. As Judge Welker put it, the fact or reason was not one of "any controlling probity."

¶ 96. As another reason, the Lake District Board stated: "Although neither parcel is riparian, both parcels are located in close proximity to public boat launch facilities." It explained that the northern parcel is located approximately 2.5 miles from the DNR boat launch site on Ellendale Road and one mile from several private boat launching facilities. The southern parcel is "located approximately 1 mile from the DNR boat launching site." It did not explain that this DNR site is on the Rock River, not the lake.

¶ 97. If Donaldson's parcels consisted of residential property, inhabited by boaters and potential boaters, the Board's reason might be relevant. But Donaldson's parcels consist of agricultural land with no residents and no improvements. There are no potential boaters on the property to take advantage of proximity, and no boats are stored there. The District must acknowledge in emphasizing this reason that Donaldson's property is not riparian and has no private access rights to the lake or river. As a result, Donaldson's property is not markedly different from property in Edgerton or Milton, or even Janesville,

except that trailering a boat from one of his two agricultural parcels to a public launch site would take a few minutes less time than trailering a boat from residential property in one of these communities. Moreover, there are properties closer to the DNR public launch site than Donaldson's properties that are not in the Lake District.

¶ 98. As its final "C"-criterion reason, the Board states: "The southerly tract has a direct view of the Rock River." This reason was supported at the hearing by a photograph taken from Knutson Road near Donaldson's southern parcel and is not disputed. In reviewing this rationale, we note that it is undisputed in the record that neither parcel has a direct view of Lake Koshkonong, and there is no evidence that there is a direct view of the river from the northern parcel. Hence, this reason for opposing detachment applies only to the southern parcel. In citing this reason, the Lake District Board is contending that agricultural land located more than eight football fields away from the river is "benefited" by a direct view of the river. This evidence is not compelling.

¶ 99. We turn now to the Board's final reason for opposing detachment, a reason related to the Lake District Board's fourth criterion, "D."[22] The Board states: "The value of both tracts will be enhanced if the water quality and recreational value of the Lake Koshkonong and associated reaches of the Rock River within the District are improved and will be diminished if the

---

[22] Paragraph D. of the Lake District Board's Criteria reads as follows: "D. Whether the value of the property would be enhanced if the lake were to be in reasonably clean, attractive and usable condition; or whether the value of the property would be diminished if the lake were to be in a degraded condition." A-124.

Indianford Dam were removed or if water quality and recreational value of the lake and associated reaches of the Rock River were further degraded."

¶ 100. In reviewing this reason, we are reminded of the legislature's findings and declaration of intent. Wis. Stat. § 33.001(1). In 1974 the legislature determined that "the protection and rehabilitation of the public inland lakes of this state are in the best interest of the citizens of this state" and "the public health and welfare will be benefited thereby." *Id.* In other words, in a broad legislative sense, residents of Milwaukee, La Crosse, Superior, Marinette, and all Wisconsin, are "benefited" by a clean, healthy Lake Koshkonong, as well as other inland lakes, because protected, rehabilitated public inland lakes "benefit" the public health and welfare. This does not mean, however, that residents of Milwaukee, La Crosse, Superior, and Marinette could reasonably be included in the Rock-Koshkonong Lake District because they are not "directly affected" by a "deteriorated condition" of this lake. § 33.001(2)(b). The same analysis must be applied in evaluating Donaldson's parcels. Are the parcels "directly affected" by some condition of these waters?

¶ 101. Is the "value" of Donaldson's two tracts enhanced by the quality of Lake Koshkonong and the Rock River? The Board bases its reason on contingencies: the "value" of the parcels will be affected "if" the water quality and recreational value are improved, or "if" the Indianford Dam were removed, or "if" water quality and recreational value were degraded. The Board does not reference what actions it has taken, is taking, or will take in this regard, nor has it explained how these actions have affected or will affect the value of non-riparian agricultural land. The Board relies on the relationship between Donaldson's properties and

193

the Rock River but does not explain how removal of the Indianford Dam would affect his properties or any properties linked to the Rock River. In all likelihood, any increased land value would depend on the conversion of the land to residential use instead of agricultural use. This contingency is inconsistent with Donaldson's testimony. Once again, the Lake District Board has failed to articulate the linkage between its reason and present benefit to the particular parcels of land.

¶ 102. To sum up, the Lake District Board exercised its will and not its judgment. It placed heavy emphasis on a requirement for a change in circumstances in a situation in which a change in circumstances was not required. It failed to address or rebut the grounds given by the petitioner. In so doing, it failed to discuss several criteria it had identified in its own rules. Although the Board gave several reasons for its decision beyond the absence of a change in circumstances, it consistently failed to explain why these reasons were relevant in showing direct benefit to Donaldson's property and why Donaldson's property was more directly benefited than many other properties not included in the Lake District. The Lake District Board consistently failed to discuss how its past, present, and future actions were benefiting Donaldson's parcels. In short, the Board was arbitrary and unreasonable. Were we to conclude that the Board's hollow, ritualistic enumeration of reasons was sufficient to sustain its refusal to detach the Donaldson properties, we would render the detachment procedure meaningless.

¶ 103. There is one additional component for certiorari review that we should mention: whether the evidence was such that the Board might reasonably make the determination in question. We conclude that

194

the evidence—the reasoning—cited by the Lake District Board was not sufficient to sustain its decision. As noted, the Board failed to link several of its reasons to a finding of benefit and failed to justify its disregard of the reasons proffered by Donaldson.

H. Lake Districts and Certiorari Review

¶ 104. This court is extremely sensitive to its obligation to afford substantial deference to any exercise of legislative power. When a lake district performs its legislative functions, it is entitled to this deference, and courts should be reluctant to invalidate its legislative decisions. Nonetheless, there must be a clear-eyed analysis of the predicament inherent in the exercise of legislative power by lake districts.

¶ 105. As a general rule, all property in Wisconsin is situated within a city, village, town, or Indian reservation, and is either taxable or tax exempt. All property within a lake district is also situated within a city, village, or town, and is subject to whatever taxes the pertinent municipality may impose. When property is included within a lake district, it is subject to an additional level of taxation: that is, it is subject to a tax on top of the tax imposed by the county, the city, village, or town, the vocational-technical district, and the school district. There must be some discernible reason why any property is required to pay an additional layer of taxes.

¶ 106. In theory, a town sanitary district is also an additional layer of government. However, cities and villages have clear statutory authority to handle sanitary issues while towns do not. As a result, towns create sanitary districts so that certain functions can be performed that cannot be performed by the towns them-

selves. In this sense, sanitary districts are not an additional layer of government.

¶ 107. Lake districts are truly an additional layer of government, and they are created by people driven by a laudable but special interest. Special interest petitioners devise the boundaries of a lake district to serve this interest and they submit their plan to a county board for approval. The county board may carefully evaluate every parcel of property to determine whether it should be included in the district. As a practical matter, this is not likely to happen. Such a review would require a conscientious board to fine-tune the proposal submitted by the petitioners and collectively draw up its own plan. This is especially unlikely to happen with respect to property located in a different county.

¶ 108. Thus, because the legislature has failed to establish clear standards for what property may be included in a district, a lake district may be a gerrymandered creation that is ultimately turned over to the people who drew the lines. Property owners disgruntled by their inclusion in the district may not have means to influence the elected county board officials who approve the creation, or the ability to punish at the ballot box either the board or the lake district commissioners who administer their own creation. In this regard, creation of a lake district has fewer checks than creation of a town sanitary district.

¶ 109. If courts are unable to provide any meaningful protection to property owners, the creation and governance of lake districts will lend themselves to serious abuse. The limitations of certiorari review do not provide much protection. Consequently, we urge the legislature to reexamine the statutes on lake districts to provide reasonable standards for legislative decisions,

whether by a county board creating a district or by a lake district board in governing a district.

## III. CONCLUSION

¶ 110. For the reasons stated, we conclude that the Lake District Board failed to render a satisfactory determination of whether Arthur Donaldson's two parcels of territory are not benefited by continued inclusion in the Lake District. The Board improperly relied on the premise that Donaldson was required to show a change in circumstances from the time the Lake District was formed, even though the Rock County Board had not made an individualized determination that his parcel would be benefited by inclusion in the district. Although the Board stated additional reasons for denying Donaldson's petition for detachment, its determination was arbitrary and unreasonable, representing its will and not its judgment. The court of appeals decision reversing the decision of the circuit court and upholding the Lake District Board is reversed, and this case is remanded to the circuit court for action consistent with this opinion.

*By the Court.*—The decision of the court of appeals is reversed and the cause is remanded to the circuit court for further proceedings consistent with this opinion.

¶ 111. N. PATRICK CROOKS, J. (*dissenting*). Because the majority fails to accord the required deference to the decision of the Lake District Board, I respectfully dissent. I disagree with the majority's conclusion that an owner of property located within a lake district is not required to show a change of circumstances in order to have that territory detached from the lake district. I

197

respectfully dissent because the majority's ruling institutes a duplicative process that undermines a county board's previous determination that each individual property in the Lake District "will be benefited by the establishment" of such district. Wis. Stat. § 33.26(3). The term "benefited" has the same meaning in § 33.26(3), the lake district creation statute, and Wis. Stat. § 33.33(3), the statute governing detachment. In coming to an opposite conclusion, the majority both improperly interpreted § 33.33(3) and failed to avail itself of case precedent illustrating that the term "benefited," as it appears in both §§ 33.26(3) and 33.33(3), refers to each individual parcel within the lake district.

¶ 112. The majority begins its discussion of the relationship between the word "benefited" in Wis. Stat. §§ 33.26(3) and 33.33(3) by agreeing that the decision to detach is legislative. Majority op., ¶ 56. The majority then states that because the term "frontage" was not included in the lake district legislation but was included in earlier drafts of that legislation, a fair inference can be drawn that the detachment procedure for lake districts was intended to be a safeguard ensuring that a property owner is provided an individual decision regarding whether the owner's specific property is benefited by continued inclusion. *Id.*, ¶ 57. The majority then concludes that the definition of benefit under § 33.26(3), which relates to whether property "will be benefited," is not the same as under § 33.33(3), which speaks to whether "territory is not benefited by continued inclusion in the district." *Id.*, ¶ 58.

¶ 113. The majority needs to look no further than the statutes themselves to determine that "benefited" has the same meaning in both Wis. Stat. §§ 33.26(3) and 33.33(3). Because both statutes are in Subchapter IV of Chapter 33, the proper rule of statutory construction

198

dictates that "benefited" should be attributed the same meaning unless the statutory context calls for a different meaning. *Wilson v. Waukesha County,* 157 Wis. 2d 790, 796, 460 N.W.2d 830 (Ct. App. 1990) (rejecting ascribing a different meaning to the word "malicious" that appeared multiple times in the same statute because the statutory structure did not call for different meanings). Here, the context does not call for a different meaning of the term "benefited."

¶ 114. In fact, the statutory context leads me to conclude that "benefited" must be defined the same way in both statutes in the same chapter. Wisconsin Stat. § 33.33(3) states, in relevant part: "Proposals for detachment shall be considered by the commissioners, and territory may be detached upon a finding that such territory is *not benefited by continued inclusion* in the district." (Emphasis added). The language, "not benefited by continued inclusion," indicates that the individual property that the owner is petitioning for detachment has *already* been determined by the county board to be benefited by inclusion in the lake district. The effect of the majority's decision is to allow members of a lake district to challenge a county board's determination that the owner's property was benefited by inclusion in the lake district by appealing to the Lake District Board without the need to show a change in circumstances. As the court of appeals noted, Donaldson's testimony during his hearing before the Lake District Board proves this point.

> [LAKE DISTRICT BOARD]: [H]as anything changed since Rock County passed the resolution forming the lake district . . . or did they make a mistake back then when they formed this lake district?
>
> MR. DONALDSON: I think they made a mistake back then because it was farm land when I bought it and I've

owned if for a number of years and it's still farm land, but I don't intend to do anything else with it other than farm land.

[LAKE DISTRICT BOARD]: So there haven't been any changes in the conditions of the property since then?

MR. DONALDSON: No.

¶ 115. The court of appeals held, as did the Lake District Board, that without a showing of changed circumstances Donaldson is not entitled to detachment.[1] I agree with them.

¶ 116. I find additional support for this conclusion in Wis. Stat. § 33.26(7), which establishes a 30–day window for a person "aggrieved by the action of the board" to petition the circuit court for review of the county board's action in including a particular property within the lake district's boundaries. The majority's approach eviscerates the legislature's intent to limit the time period that a property owner has to challenge such a decision by a county board. Chapter 33 also undercuts the majority's concern that property owners will be compelled to remain in lake districts in perpetuity, unless they can challenge the county board's determination that their property is benefited by inclusion in the lake district by way of Wis. Stat. § 33.33(3) without any showing of changed circumstances. Chapter 33 provides property owners with two reasonable options: An owner can make a timely petition, initially, under § 33.26(7), challenging a county board's decision to include the owner's property in a lake district, and an owner can also, later, petition for detachment if the

_____

[1] Rock-Koshkonong Lake District Resolution 99–03, Section III(F) states, in relevant part, that the Board may consider "[w]hether circumstances surrounding the property's inclusion in the District have changed."

owner is able to demonstrate changed circumstances under § 33.33(3). If shown, such circumstances would allow a lake district board to order detachment.

¶ 117. The majority acknowledges that application of *Fort Howard Paper Co. v. Fox River Heights Sanitary District,* 250 Wis. 145, 26 N.W.2d 661 (1947), leads to the conclusion that this case is subject to certiorari review. However, it fails to give deference to language in *Fort Howard,* as the court of appeals pointed out, illustrating that a finding that an entire district is "benefited" means that each individual property in the district has the potential to be benefited.

¶ 118. In *Fort Howard,* a property owner argued that its property should not be included in a sanitary district because its individual property was not benefited by inclusion. *Id.* at 152. Fort Howard asserted that in order to be included in the district, its property had to be immediately benefited by such inclusion. *Id.* Focusing on benefit to the property of the district as a whole, this court disagreed, concluding that when such property as a whole is benefited then each individual property within the district is benefited by inclusion in the district. *Id.* The fact that the individual property did not realize immediate benefits did not preclude the formation of the district. *Id.* The *Fort Howard* court stated:

> If the town board finds that the property within the boundaries of the proposed district as a whole will be benefited then the district is to be organized. For example, if some parcel of land was included in the proposed district which lay out of the watershed and could not be served by the proposed improvement, manifestly a property so situated could not be benefited. If all the property within the boundaries of the proposed district is in the watershed and the proposed

201

> improvement *may* serve it, then the *property of the district as a whole is benefited* and the town board if it makes the other necessary finding may organize the district.

*Id.* (Emphasis added).

¶ 119. The court of appeals properly interpreted this directive from *Fort Howard* and commented: "Stated differently, a finding that a district as a whole is 'benefited' will stand unless some parcel in the district is not benefited by the inclusion." *Donaldson v. Bd. of Comm'rs of Rock-Koshkonong Lake Dist.*, 2003 WI App 26, ¶ 15, 260 Wis. 2d 238, 659 N.W.2d 66.

¶ 120. Further affirmation for this interpretation of *Fort Howard* emerges from the court of appeals' statement that "[t]his reading of *Fort Howard* is further supported by the subsequent discussion of the particular facts in that case and the supreme court's conclusion: 'it appears from the undisputed evidence that the property of the plaintiff will be benefited.' " *Id.* The court of appeals pointed out that "[i]f benefit to the individual parcel at issue in *Fort Howard* was irrelevant, the supreme court would not have explained why the parcel was benefited." *Id.* The court of appeals went on to conclude that the text of Subchapter IV in Chapter 33 did not suggest that the term "benefited" had a different meaning prior to the time when the lake district was formed than it had after it was formed. *Id.*, ¶ 21. Again, not requiring Donaldson to show a change in circumstances is contrary to the language and proper interpretation of the statutes at issue.

¶ 121. As mentioned above, the court of appeals' interpretation of the language "benefited" was correct. In upholding the Lake District Board's decision to deny Donaldson's petition, the court found persuasive the

Board's argument "that Donaldson's opportunity to challenge whether his property was properly included in the District is governed by Wis. Stat. § 33.26, and because Donaldson failed to avail himself of that opportunity, he must now demonstrate a change in circumstances showing he is no longer 'benefited,' using the same definition of 'benefited' used by the county board when the Lake District was created." *Id.,* ¶ 12. Unlike the majority, the court of appeals did not fail to give weight to the Board's decision when determining that the property included in the Lake District would potentially benefit by such inclusion.

¶ 122. The majority's decision ignores the legislative role of both the County Board and the Lake District Board. The majority concedes that certiorari review of a detachment decision does not allow it to substitute its judgment for the Lake District Board's determination. Majority op., ¶ 51. Yet, by not recognizing that the County Board's original finding that each property benefited by inclusion in the Lake District, by failing to apply the rules of certiorari review, correctly, and by failing to accord to the Lake District Board's decision the presumption of correctness, the majority has wandered from the correct analytical path into a thicket of error. While claiming to recognize the presumption, the majority only applies the presumption of correctness to the County Board's creation of the Lake District, *see* majority op., ¶ 53, n.13, even though the majority recognizes the decision of the Lake District Board on detachment to be a legislative one. Majority op., ¶¶ 4 and 56.

¶ 123. As the majority notes, "a court may not exercise legislative power." Majority op., ¶ 48 (quoting *Fort Howard,* 250 Wis. at 150). Yet the majority seems to ignore this directive by according the Lake District

203

Board's decision little or no deference. The decision of the Board is a legislative determination. *See Joint Sch. Dist v. State Appeal Bd.,* 56 Wis. 2d 790, 794 203 N.W.2d 1 (1973). When reviewed on appeal, the Board's decision should be reviewed to determine whether it exceeded its jurisdiction or acted arbitrarily or capriciously. *Id.* at 795. A presumption of correctness must be afforded to a decision of a board such as the Lake District Board, if there is no violation of those factors.

¶ 124. More specifically, I agree with the majority (*see* majority op., ¶ 4) that the only factors a court may properly consider on review are as follows: (1) Whether the board kept within its jurisdiction; (2) whether the board acted according to law; (3) whether the board's action was arbitrary, oppressive or unreasonable and represented its will and not its judgment; and (4) whether the evidence was such that it might reasonably make the order or determination in question. *State ex rel. Mitchell Aero v. Bd. of Review,* 74 Wis. 2d 268, 281–82, 246 N.W.2d 521 (1976) (citing *Dolphin v. Bd. of Review,* 70 Wis. 2d 403, 408, 234 N.W.2d 277 (1975)).

¶ 125. The court of appeals properly recognized these principles of certiorari review. *Donaldson,* 260 Wis. 2d 238, ¶ 10. The court focused its analysis on the second prong, since the circuit court found that the Board acted contrary to law.[2] The court reasoned that because the Lake District Board proceeded on the correct theory of law—a property owner who is part of a lake district must show a change in circumstances in order to successfully petition for detachment from that

---

[2] The circuit court, in its decision, determined that the decision of the Lake District Board was contrary to the statute and that no change of circumstances was required for detachment.

district—it did not have to address the remaining three factors. *Id.* I conclude that the Lake District Board was right in its assessment and provided sufficient support for its decision not to grant detachment.

¶ 126. The Board provided detailed reasons justifying its position that Donaldson's request for detachment should be denied. The Board stated the following, in relevant part:

> First, both tracts were within the original boundary of the District approved by the Rock County Board of Supervisors Resolution 99–A-038.
>
> Second, the Rock County Resolution included a finding that the property included in the District will be benefited by the establishment of the Rock-Koshkonong Lake District.
>
> Third, no evidence has been provided to the commission indicating that there has been any change in the property inconsistent with the Board of Supervisors' findings that these tracts benefit from inclusion in the District.
>
> Fourth, both tracts are within the Rock River watershed, and within the subwatershed areas that drain into the portions of the Rock River and Lake Koshkonong within the boundaries of the district.
>
> Fifth, both tracts are located in near proximity to Lake Koshkonong and the portion of the Rock River within the District. . . .
>
> Sixth, although neither parcel is riparian both parcels are located in close proximity to public boat launch facilities. . . .
>
> Seventh, the southernly tract has a direct view of the Rock River.

. Eighth, the value of both tracts will be enhanced if the water quality and recreational value of Lake Kosh-konong and associated reaches of the Rock River within the District are improved and will be diminished if the Indianford dam were removed or if the water quality and recreational value of the lake and associated reaches of the Rock River were further degraded.

¶ 127. After detailing these considerations, the Lake District Board finally concluded that Donaldson's territory was benefited by its inclusion in the District. Nevertheless, the majority concludes that the Board "exercised its will and not its judgment." Majority op., ¶ 102.[3]

---

[3] I strongly disagree with the majority's characterization of the Board's decision-making process. The Board clearly exercised its judgment in applying the criteria set forth in Rock-Koshkonong Lake District Resolution 99–03, Section III. Section III states, in relevant part:

> In its consideration of whether the subject property is benefited by continued inclusion in the District, the Board may consider:

> A. The physical characteristics of the property.

> B. Its use (recreational, commercial, residential, etc.).

> C. Its relationship to the lake in terms of whether:
> 1. It is riparian;
> 2. It has private access rights to the lake;
> 3. Its proximity to public access to the lake;
> 4. It is within view of the lake; and
> 5. It is within the watershed or ground water table of the lake.

> D. Whether the value of the property would be enhanced if the lake were to be reasonably clean, attractive and usable condition; or whether the value of the property would be diminished if the lake were to be in a degraded condition.

> E. Whether detachment of the property will result in any "hole" or "island" in the boundaries of the District.

¶ 128. While the majority provides what the Lake District Board could have used as an alternative analysis, that analysis is no more reasonable than the one applied by the Board. The Board need not look to every criteria it had established for a review of a petition for detachment. The majority admits that those factors are guidelines—not mandatory. The majority's inappropriate application of certiorari review is best exemplified by its own fact-finding that an increase in property value results from recreational use, not agricultural use. The majority fails to take into account the potential that land included in the Lake District will experience increases in its property value, not only because of the activities on that property, but also as a result of the activities occurring on other properties included in the Lake District.

¶ 129. For all of the foregoing reasons, I respectfully dissent.

¶ 130. I am authorized to state that Chief Justice Shirley S. Abrahamson and Justice Ann Walsh Bradley join this dissent.

---

F. Whether circumstances surrounding the property's inclusion in the District have changed.

G. Any other factors relevant to whether the property is benefited by continued inclusion in the District.